### HAMILTON MFG. CO. v. TUBBS MFG. CO. et al.

(Circuit Court, W. D. Michigan, S. D. October 20, 1908.)

No. 1577.

1. INJUNCTION (§ 56*)—SUBJECTS OF PROTECTION—TRADE SECRETS.

To entitle a complainant manufacturer to protection against the use of its unpatented machines and methods by others, it must appear that they are in fact secret, and it is not entitled to an injunction to restrain the use of machines copied from its own by another manufacturer, which obtained its information respecting the same from former employés of complainant, who were not informed and had no knowledge that the same were secret.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 110; Dec. Dig. § 56.*]

---

2. TRADE-MARKS AND TRADE-NAMES (§ 93*)—UNFAIR COMPETITION—SUIT FOR INJUNCTION. .

Evidence *held* insufficient to establish the charge of unfair competition by a defendant by making, advertising, and selling articles which were imitations, except in minor details, of those made and sold by complainant and to entitle complainant to an injunction.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 104–106; Dec. Dig. § 93.*]

3. TRADE-MARKS AND TRADE-NAMES (§ 70*)—UNFAIR COMPETITION—USE OF SIMILAR TRADE-NAME.

The use by defendant of the name "New Idea" for a type case made and sold by it *held* not so similar to the name "New Departure," used by complainant for a similar article as to constitute unfair competition, the cases themselves being different in several respects, and each bearing the maker's name.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. § 70.*

Imitation or simulation of trade-mark or trade-name as unfair competition, see note to John H. Rice & Co. v. Redlich Mfg. Co., 122 C. C. A. 447.]

4. TRADE-MARKS AND TRADE-NAMES (§ 68*)—UNFAIR COMPETITION—COPYING FROM COMPETITOR'S CATALOGUE.

The fact that defendant, a competing manufacturer, in making its catalogue copied cuts and descriptive matter, relating to articles which it might sell as well as complainant, from complainant's catalogue as well as from those of other manufacturers, *held* not an invasion of complainant's rights which entitled it to an injunction.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 79; Dec. Dig. § 68.*]

In Equity. Suit by the Hamilton Manufacturing Company against the Tubbs Manufacturing Company and others. On final hearing. Decree for defendants.

Taggart, Denison & Wilson, of Grand Rapids, Mich. (L. J. Nash, of Manitowoc, Wis., and Geo. E. Waldo, of Chicago, Ill., of counsel), for complainant.

Knappen, Kleinhans & Knappen, of Grand Rapids, Mich. (M. B. Danaher, of Ludington, Mich., and Burke & Craite, of Manitowoc, Wis., of counsel), for defendants.

SATER, District Judge (sitting by designation). The court is indebted to counsel for their painstaking abstracts of the voluminous record. They have discussed the case with ability. The conflict of evidence, however, as to many points, is so sharp, and the interest of many witnesses is such, that I read the entire record to enable me the better to determine the questions of fact.

Whether the complainant's machines and processes of manufacture were secret or not is the first question which I shall consider.

J. E. Hamilton testified that strangers were always prevented from going through the complainant's factory, that they might not see its special machines and methods of work. He says there were shop secrets which he did not wish to give to the public; that he further wished to avoid interference with his workmen; that every foreman in the factory talked to him a good many times about the admission of strangers; and that it was thoroughly understood between him and them that the principal reason for the exclusion of strangers was to prevent disclosures as to special machines and methods of manufac-

ture. De Lill, one of the complainant's foremen, testified: "A. I was told to keep strangers out without a pass. Q. Told by whom? A. By Mr. Hamilton, and also our people without a pass, because they interfered with the workmen." He admitted strangers, as well as residents of the vicinity, on passes, with a warning to the latter not to interfere with employés too long. In the instructions given him non-interference with the workmen was alone impressed upon him. The conclusion is deducible from his testimony as a whole that both strangers and residents were sometimes admitted to the factory without passes. He is credited, however, by the defendant Kurtz with having excluded from the factory Hamilton's former partner. Wiese, another of complainant's foremen, understood the purpose of the pass system, which was introduced in 1893, to be to keep men from talking to the workmen and seeing certain machines. Johannes, another foreman, understood the purpose of the pass system to be to keep people from seeing how things were made and what was done, and says that Hamilton instructed the foremen to enforce the rule requiring visitors to have passes. His source of knowledge upon this point is not stated. He excluded from the factory Nash, a stockholder in the complainant company, because he was without a pass and unknown to him. Frank Kaufman, the complainant's superintendent, understood the purpose of the pass system to be to avoid the disclosure of ways of work and secret machines and to prevent any interference with the workmen.

Objection was interposed to Wiese and Kaufman giving their understanding, on the ground that it was the statement of a conclusion. None of the last three witnesses testified when or from whom he obtained his understanding of the purpose of the pass system, or on what facts it rested. None of the last four witnesses testified that Hamilton instructed him that the exclusion of visitors or the purpose of the pass system was to hold secret any of the complainant's machines or methods of manufacture. Wiese and Kaufman make no mention of having received from him any instructions whatsoever.

Considering now the defendant's witnesses, Gagnon, the complainant's former draftsman and designer, testified that all he knew about the pass system, and the only reason known to him for its existence, was that the employés should not be diverted from their work by visitors. Anton Kaufman, a former foreman of the complainant, testified that the object of the pass system was to avoid interference with workmen. Neither of these witnesses was interrogated as to the source of his knowledge regarding the purpose of the system. Kaufman never heard it said by Hamilton, or the superintendent, or any foreman, that the special machines were to be kept from the eye of strangers, nor did he ever hear such idea expressed. Kurtz, also a former foreman of complainant, testified that the pattern room was not kept secret, that both workmen and strangers were admitted to it, some having passes and some not, and that the public was sometimes excluded and sometimes not. His testimony does not consist with the complainant's position.

The conflict in the testimony of the above-named witnesses is such that the consideration of other facts and circumstances disclosed by the record becomes important.

The eight machines named in the bill, excepting the slat rounding machine, which was installed in 1899, were all put into operation from one to six years prior to the inauguration of the pass system. The case boring machine was introduced in 1887; the case frame routing machine in 1888; the slat slotting machine in 1888 or 1889; the disc joiner and endwood machine in 1892; the reglet machine and the machine for sizing and smoothing slats not earlier than 1890 or later than 1892. These machines were principally made in Hamilton's shops. There is no evidence that any secrecy was enjoined on any person employed in drafting designs, making patterns for the construction, or assisting in the construction of any of the last-named seven machines. When completed, the machines were all located as desired in the factory, were used by workmen without any communication made to them as to their secret nature, and were exposed to the gaze, not only of the employés operating the machines or workmen in the factory, but of visiting strangers and residents of the city. All that any one needed to do to acquaint himself with the machines, in so far as knowledge could be acquired by the sense of sight, was to enter the complainant's service. This statement, however, is subject to the modification arising from the fact that over each reglet, slat rounding, and endwood machine used by the complainant was a hood which concealed from view such machines' interior working and arrangement, but Hamilton himself testified that there was no other purpose in placing the hoods over those machines than to take care of sawdust. Concealment was an incident and not the design, because he says he does not claim that the hoods were to cover the machines to keep them secret. It is not shown or claimed that any notices or rules were posted, warning would-be sight-seers against intrusion, or enjoining employés against their admission, or that subordinates were informed by the management or foremen that any machine or method was deemed secret. It seems that the factory, during a portion of the time at least, was so insecurely guarded at night that the curious might, without great difficulty, have entered and gained access to the machines and other property now claimed to be secret. Visitors, whether strangers or residents of the vicinity, were supplied with passes, to which coupons were attached, admitting them to any floor of the factory. Some persons were allowed to go through the plant without passes. Employés, as well as visitors, were admitted to the pattern room, and the former would at times watch the work of drafting in the drafting department, and in some instances witness the preparation of blueprints. It is in evidence that such employés would move on as foremen appeared, but it is not affirmatively shown whether or not that was due to their knowledge of a system of secrecy or to a desire to avoid the appearance or consequences of loitering.

Although where an idea, or trade secret or system, cannot be sold or negotiated or used without a disclosure, it would seem proper that some contract should guard or regulate the disclosure, otherwise it must follow the law of ideas and become the acquisition of whoever receives it (Bristol v. Equitable Life Assurance Society, 132 N. Y. 264, 267, 30 N. E. 506, 28 Am. St. Rep. 568, citing Peabody v. Norfolk, 98 Mass. 452, 96 Am. Dec. 664), it is not claimed that there was any

express contract made at any time with the defendants Gagnon, Kaufman, and Kurtz, or with any other employé in the complainant's factory to hold secret the machines used by complainant or its methods of operating the same, nor is it suggested by the record that either before or after the pass system was introduced any of the individual defendants or any other person in complainant's employ, unless it be Deitrick, was taken into or retained in the complainant's service or promoted to a higher position on condition of nondivulgence of any secrets, real or alleged, theretofore known or that might thereafter be acquired. Hamilton, it is true, testified that he had a "general understanding" with Deitrick, who aided in constructing one of the machines some five or six years before his testimony was given, not to build such a machine for another, and that he stipulated with a party at Coshocton, Ohio, for whom he built one of his machines, that such party should keep such machine away from the public and allow no one to see it as far as he was able, and should return the machine if he ceased to use it. Some such arrangement existed as to another machine furnished to another concern. But it is not shown that the existence of such "general understanding" with Deitrick, or the making or existence of any such contract or contracts as to the machines built for the use of others, was made known to the individual defendants or to any employé, subordinate or otherwise. It is affirmed on the one side, and denied on the other, that Kaufman assisted in making the patterns of the first reglet machine, and that he not only made the patterns for the new endwood machine, but that the idea of the machine itself originated with him, and was suggested by him to Hamilton. Whatever the fact may be in that respect, it is not claimed or shown by the record that there was any stipulation with any employé other than Deitrick that any ideas which Hamilton or such employé might advance should become the exclusive property of the complainant company. Kaufman, soon after entering the complainant's employ, began to make patterns, and continued in that capacity until the time of his resignation. He necessarily acquired an intimate knowledge of all the machines. One cannot read the record without conceding that the machines in question were well adapted to the use to which they were put; but, in view of the claim now made of their excellent and money-getting qualities, and of the inventive genius displayed in developing them, it is remarkable that those easily proved precautions which are ordinarily exercised to surround, with an air of secrecy, devices, formulæ, and the like, of a secret nature, were not invoked and maintained by the complainant to safeguard its property, if its machines and methods of manufacture were in fact deemed novel and secret. There is force in the contention that the failure of the complainant to avail itself of the ordinary safeguards employed in factories having trade secrets is attributable to its having adapted old ideas and well known and extensively used woodworking machines to the requirements of its particular needs. The number of factories providing goods of the kind manufactured by the complainant was so limited as not to meet the wants of manufacturers of such goods, and yet machines doing the same character of work and involving the same principles found in the complainant's machines were in common use in

woodworking establishments. For instance, the center boring machine was a well-known device, and used for different purposes by woodworkers. Complainant adapted it to its use by reducing it in size and devising the centering device. The disc joiner is a double disc sander, but the use of disc sanders long antedated complainant's employment of the same. The endwood machine is a combination and adaptation of two ordinary machines, the Berlin sander and the Daniels planer. The reglet machine is a double drum sander, with such modifications and additions as suited it to complainant's purposes, but double drum sanders were not novel.

Frank Kaufman, on cross-examination, after testifying as to the endwood, reglet, disc joiner, edge rounding, slat slotting, case boring, and case framing machines, stated that the only devices connected with any of those machines that he had not seen used on some kind of a machine for some purpose were the putting of sandpaper on a hard surface instead of a yielding one, and the use of the centering device in the boring machine.

Hamilton testified regarding the endwood machine that the one feature more than any other essential to its success is "the cementing or gluing of paper directly onto a hard and unyielding roll." Regarding the reglet machine he said, "the principal feature of this machine is in the unyielding surface of the drum, the same as in the endwood machine," and again he testified, regarding the endwood, disc joining, reglet and slat sizing and smoothing machines, that their principal feature is the use of sandpaper upon a hard, unyielding surface, which permits the cutting away of the stock instead of its mere smoothing. Again he testified, "The germ of the machines, of all these machines, our special machines, is the sandpaper."

The application, however, of sandpaper directly to the surface of a machine for cutting as well as smoothing purposes was practiced before any of the complainant's machines were devised or placed in service, and was superseded by the later method of interposing a cushion between the sandpaper and the machine's metallic surface. The principal feature of these machines was not novel, but well known. The testimony of Spencer, whom I believe to be a witness that is fair-minded, intelligent, and of large experience, places this question of want of novelty beyond the realm of doubt. If it be conceded that the peculiar adaptations devised by the complainant, such for instance, as the centering device on the center boring machine, or the iron block used as a chip breaker in the case frame routing machine, cannot be lawfully used by others who did not originally invent or devise the same, it is clear that the machines, stripped of complainant's respective peculiar devices, may be used by others, and the evidence shows that other effective devices, accomplishing the same purposes, readily suggest themselves to a mechanic of ordinary skill. Eliminating such peculiar devices, none of which appear to have been the principal feature of the particular machine to which it was attached, Gagnon, Kaufman, and Kurtz might have acquired knowledge of the principal features of the machines in question in the employ of any wood manufacturer doing a considerable business.

[1] In Cincinnati Bell Foundry Co. v. Dodds, 19 Wkly. Law Bul. (Ohio) 84, Judge Taft said:

"The property in a secret process is the power to make use of it to the exclusion of the world. If the world knows the process, then the property disappears. There can be no property in a process, and no right of protection, if knowledge of it is common to the world. It would be a violation of every right of an employé of a manufacturer to prevent the former from using, in a business of his own, knowledge which he acquired in the employ of the latter when he might have acquired such knowledge in the employ of other manufacturers. Indeed, a contract not to do so would probably fail of enforcement because in restraint of trade."

To grant to the complainant the exclusive use of a form of machine in common use, like, for instance, the disc joiner, the center boring machine, or any machine used for cutting or smoothing by means of gluing sandpaper to a metallic surface, would foster monopoly and exclude others from the use of well-known and much-used prior devices. To entitle it to protection against the use of its machines and methods of manufacture by others, it must appear that they are in fact secret, for, as said in Hopkins on Trade-Marks, 226:

"In every case where the plaintiff seeks protection for a trade secret, it must appear that it really is a secret. If a so-called secret process is lawfully known to others in the trade, no one will be enjoined from disclosing or using it."

See, also, Cincinnati Bell Foundry Co. v. Dodds.

So, too, to enforce on the individual defendants the duty of preserving the secrets, if any, pertaining to the complainant's business, it must be shown that they knew that its methods of manufacture and machines were in fact secret.

In the Cincinnati Bell Foundry Co. Case, supra, the rule is thus stated:

"If there was a secret * * * and he came to know it because he was foreman and had to know it that it might be used, *and knew that it was a secret*, then I am inclined to think that his obligation to preserve such secret as the property of his employer must be implied, even though nothing was said to him on the subject."

In Westervelt v. National Paper, etc., Co., 154 Ind. 673, 678, 57 N. E. 552, it was said:

"If a person employs another to work for him in a business in which he makes use of a secret process, or of machinery invented by himself, or by others for him, but the nature and particulars of which he desires to keep a secret, and of which desire on the part of the employer the employé has *notice* at the time of his employment, even if there is no express contract on the part of the employé not to divulge said secret process or machinery, the law will imply a promise to keep the employer's secret thus intrusted to him."

Considering all the facts and circumstances developed by the record, the complainant has not, within the rules of evidence, established that its machines and methods of work were in fact secret, or that the individual defendants knew or had cause to believe that they were secret or intended to be held as such.

The Tubbs reglet machine is in such an exact similitude to the complainant's that it is strongly urged that the blueprint from which the

defendant company's machine was constructed was abstracted from the complainant's files. Anton Kaufman had long been a pattern maker for complainant. Shortly prior to the withdrawal of himself and Gagnon from the complainant's employ, the complainant constructed a new reglet machine, for which Kaufman made the patterns. He testified that after his resignation he noted down such of the dimensions of that machine as he could recall, and that from such notes and his recollection, the blueprint was made which he produced as a witness, and which was offered in evidence. In view of his experience, he would have been a dull man had he not been able to recall a considerable number of the machine's dimensions. Some of the patterns which he made for the Tubbs machine, he said, were not correct, but that with the assistance of the builder, the portions concerning which his patterns were at fault were wrought out and adapted to those which were correct. The machine is, in fact, a simple one. The chain of gear wheels gives it the appearance of being complicated, but the problem of the gear wheels would not be difficult for an ordinarily skilled mechanic. Kaufman knew the size of the drums. If, in addition, he knew the speed with which they were to move, the size and location of the gear wheels became an easy problem. As a pattern maker he could not make patterns from the blueprint without supplementing what is shown on it by other knowledge, for the blueprint gives no dimensions. It is not the work of a skillful draftsman. It is not correct in all its parts, as appears from the screws shown in the rear of each gear wheel. As Gagnon made a blueprint for the complainant company after its machine was partly built and while having access to it and complainant's other reglet machines of earlier construction, it is remarkable that he should have made such an error. If the complainant's theory be accepted, Kaufman was so dishonest as to pilfer the blueprint and so untruthful as to testify falsely, and yet so honest as to admit freely his possession of the blueprint and produce it in court, and thereby supply the evidence to establish his dishonesty and untruthfulness. This is more improbable than his version of the construction of the machine. I am not prepared to say that the reglet machine of the Tubbs Company was not constructed as Kaufman has stated.

[2] Considering next the charge that the defendant company is wrongfully manufacturing, advertising, and offering for sale certain articles which are mere imitations and reproductions of those of the complainant, whereby unfair competition in trade results, it will be noted that in many respects the evidence introduced by the contending parties as to the Tubbs New Idea case and the complainant's New Departure case does not conflict. Prior to the introduction of the New Departure case, cases consisted of a frame to which was nailed an ordinary single-piece basswood or poplar bottom, about three-eighths of an inch thick. Some cases were made by Morgan & Wilcox with such a bottom covered by manila paper. The cases, when shoved into the cabinet, slid crosswise of the grain on their bottoms. The bottom of each rested on the slide, whether wooden or steel, that supported it in the cavity. The slats in the cases were put in grooves cut upward from the bottom inner edge of the frame. The type compartments and

internal arrangement of the old cases were precisely the same as in the two cases in question. What the Hamilton company did in the way of modifying the old style of case was to substitute a three-ply veneer bottom about three-sixteenths of an inch thick, instead of a single-piece bottom. A groove was made in the frame to receive the bottom, extending upward, from which were other grooves to receive the slats, which were to be locked in the case by the bottom. The bottom was also tacked to the frame. The groove in which the bottom was inserted being somewhat above the lower edge of the frame, that portion of the frame constitutes a slide on which the case moves when being shoved into or drawn from the cabinet. The grain of the under layer of the veneer bottom is so arranged that the case slides with, instead of across, the grain of the bottom. The paper covering on the bottom and the other features of the old cases are retained. The New Idea case differs from the old style case in the use of the three-ply veneer bottom, which is held in position, not by a groove, but by being nailed to the frame. The reduction in the thickness of the bottom permits the lower portion of the frame to serve as a slide, and, as I understand, the grain of the lower layer of the veneer bottom runs with that of the case. The paper covering of the bottom was omitted. One manufacturer, Simonds, now out of business, formerly made the same sort of case as the Tubbs Company manufactures, excepting that he retained the paper covering of the bottom. The old style case was manifestly standard. "Departure" is defined in the Century Dictionary, "Deviation or divergence, as from a standard rule or measurement." The Hamilton company in fact made a deviation or divergence in the manner above indicated from the standard form of goods. "Idea," as defined by the same authority is: "A conception of what is desirable or ought to be, different from what has been observed." The Tubbs Company case expresses the originator's conception of what he deemed desirable, different from what had been observed. Every element embodied in it had been utilized in previously manufactured cases, but in no one style had all the elements found in it been combined. The complainant cannot successfully claim an exclusive right to the use of a three-ply veneer bottom. Neither can it deprive another of the privilege of nailing the bottoms of his cases to the frames, if he so desires.

[3] As regards the names of the two cases, a trade-name appeals to the ear rather than to the eye. N. K. Fairbank Co. v. Luckel, King & Cake Soap Co., 102 Fed. 327, 42 C. C. A. 376. The names are not so similar as to confuse or deceive the ordinary purchaser giving such attention as such purchaser usually gives in the purchase of goods. The case made by each party bears the maker's name. The bottom of the one is covered with manila paper. In the other such covering is wanting. No effort has been made to sell the defendant's case as that of the complainant. The ordinary purchaser buying with ordinary caution will not, I think, be deceived into mistaking the manufactured article of the one for that of the other.

It is conceded that a considerable part of the goods manufactured by both corporations are standard goods, but it is urged that the defendant company not only needlessly imitated the New Departure

cases, but other articles manufactured by the complainant, and to such an extent as to render the two makes of goods indistinguishable to the purchaser of ordinary intelligence. It is admitted that the complainant copied standard goods made by others, and in working out its designs bought the goods of other manufacturers to ascertain how they were made, and "usually improved upon them before putting them on the market." For instance, a steel-run stand made by another manufacturer was purchased, improved upon, and made the basis of complainant's article. So the plow and press manufactured by another was adopted without any very material alteration. This seems to be not unusual in the case of unpatented articles. The bottoms of the steel-run cabinet and printer's cases manufactured by the complainant are covered with manila paper. Those made by the defendant company are not so covered, and the cases are cut away a trifle from the lower part of the frame. The cases made by the complainant bear its name. Those manufactured by the defendant company bear its name. The pulls on the goods made by the Tubbs Company are different from those made by the complainant, and the name of the Tubbs Company is found on each pull. In some instances the beading on the defendant company's goods differs somewhat from that on the complainant's goods, and the finish is somewhat more glossy. It is not claimed or shown that the Tubbs Company has ever sold or offered for sale any of its goods as the product of the complainant. In general appearance and finish the goods of the one company are very similar to those of the other, but the articles made by each are so stamped as to clearly indicate their origin, and only the careless or ignorant purchaser can be deceived. Diamond Match Co. v. Match Co., 142 Fed. 727, 74 C. C. A. 59. Each party has adopted a distinguishing mark to denote the origin of the production of its own goods, and thus to obtain the benefit of any good reputation which they may have or may acquire, but neither of them may distinguish its goods by such universal characteristics as belong to other goods of the kind which the general public have the undoubted right to use. From the necessities of the case, the goods of the parties must resemble each other in form, dimensions, and appearance. Neither can enforce an exclusive right as to the interior arrangements of its cases, nor as to the kind of wood or material of which they may be made, nor as to their style of finish, unless it be peculiar and out of the ordinary. Neither of the parties may appropriate to its own purposes any common and general characteristics of its goods—none of them being patented—to such an extent that the other may not freely use such characteristics in its own cases. Globe-Wernicke Co. v. Fred Macey Co., 119 Fed. 696, 56 C. C. A. 304; Marvel v. Pearl, 133 Fed. 160, 161, 66 C. C. A. 226. From the testimony as a whole I am of the opinion that the defendant has not so demeaned itself as to justify enjoining it for too close an imitation of the complainant's goods.

[4] Regarding the cuts and pictures in complainant's catalogue and its circulars and advertising matter, which it is claimed the defendant company copied, it appears that the catalogue was not copyrightable. As a proper and necessary means of advertising, it was distributed to complainant's customers and used in soliciting trade, and was design-

ed to reach an indefinite number of dealers, who, in transacting their business, were at liberty to exhibit it to a still larger but indefinite number of purchasers. No implied contract, as charged in the bill, was shown with customers to whom the catalogue was sent, retaining ownership thereof in the complainant and prohibiting its gift by consumers to complainant's competitors. Representatives of the defendant company and of Binner, Wells & Co., of Chicago, who prepared the engravings for the defendant's catalogue, testified at length as to the various steps leading up to the production of the cuts from which the engravings were made. A great volume of testimony was introduced, on the one hand to show, and on the other hand to disprove, that the complainant's catalogue was, to a considerable extent, copied by the defendant company. Hammersmith made photographs of about 30 corresponding cuts in the complainant's catalogue, reduced them to the same size, and stripped them on gelatine films for comparison. There were found in some instances some minor differences in the cuts, but the sameness is too striking to be a mere coincidence. There is no denial of the use of the catalogue of the complainant and of other manufacturers in preparing that of the defendant company, but this seems to be a familiar practice to a considerable extent in the building of catalogues. The point on which the parties differ is the extent of such use. Whatever the extent and method pursued may have been, I am of the opinion that the defendant company drew considerably from the complainant's catalogue in the preparation of its own. Even errors found in some of the cuts of the complainant's catalogue appear in the cuts of the defendant. The Tubbs Company's catalogue was issued for the purpose of advertising its goods for sale and promoting its trade by the sale of its manufactured articles, and, such being the fact, if it did copy from complainant's catalogue cuts of articles which it might sell as well as the complainant, it committed no offense of which the court can take cognizance. Baker v. Selden, 101 U. S. 106, 25 L. Ed. 841; Lamb v. Grand Rapids School Furniture Co. (C. C.) 39 Fed. 474; Mott Iron Works v. Clow, 82 Fed. 319, 27 C. C. A. 250; Jewelers' Mercantile Agency v. Jewelers' Weekly Publishing Co., 155 N. Y. 241, 49 N. E. 872, 41 L. R. A. 846, 63 Am. St. Rep. 666.

Without enumerating the differences between the two catalogues, suffice it to say that they are so apparent as to preclude belief on the part of the customer of ordinary intelligence that the defendant's catalogue is an advertisement of the complainant's wares, and there was consequently no invasion in this respect of complainant's rights, nor was there any such invasion, on the facts of this case, by the defendant, by its copying from the complainant's catalogue and circulars descriptive matter, weights, dimensions, and the like, in so far as that was done. Potter Drug & Chemical Corp. v. Pasfield Soap Co. (C. C.) 102 Fed. 490.

Nor is the complainant entitled to relief because its catalogue was used by the defendant's traveling salesmen, as there is no evidence that such use was fraudulent or illegitimate. Lamb v. Evans (1892) 3 Ch. 462, 469, 470.

I do not deem it necessary to discuss the discount sheet gotten out by the defendant company under date of December 14, 1904, or the publications charged to be libelous, for, as the issuance and use of such sheet and of the matters charged to have been libelous were discontinued prior to the commencement of this action, and a disclaimer of further practices in those directions has been entered, injunction will not lie. National Tube Co. v. Eastern Tube Co., 3 Ohio Cir. Ct. R. (N. S.) 459, affirmed by the Supreme Court without report, 69 Ohio St. 560, 70 N. E. 1127.

There are other charges of unfairness, even of dishonesty, a detailed discussion of which would unduly prolong this already lengthy opinion. Lomack's conduct in obtaining bits through another from complainant's factory was done at his own instance. Knowledge of his conduct has not been brought home to any of the defendants, and they should not be held responsible therefor. Although the bartender, Kurtz, did not know the contents of the paper package which he delivered to the defendant Kurtz, the evidence is strongly suggestive that such defendant sought and obtained routing bits from the complainant's factory through connivance with one of complainant's employés. It is not shown, however, that the defendant company ever used them or is using them now. If such bits were so obtained, the remedy, under the facts of the case seems to be in damages. National Tube Co. v. Eastern Tube Co., supra.

As to the charge made concerning other bits, spying and trespassing on complainant's factory, the purloining of drawings, detail books, blueprints, Hebrew type patterns, dimension books, page specimen books, the effort to secure slide patterns, steel runs and moldings, and the inciting of strikes, the evidence is conflicting. The complainant's case rests on the charge of fraud. The presumption is in favor of the fairness of the conduct of the defendants and of the innocence of the accused, and the burden of proof is upon the party asserting the fraud to establish it. As regards the matters above mentioned and other charges concerning which testimony was offered, the proof is not sufficiently clear to justify the granting of the relief requested.

The parties to this action have waged a needlessly bitter rivalry. Persons connected with the defendant company have pressed close to the line of demarcation between fair and unfair competition. Some of their conduct is not commendable, but I do not believe the situation justifies the granting of an injunction. Some explanation for their conduct may be found in the threat of the complainant's chief officer— a threat which he would not say he did not make—that he would destroy the defendant company or bankrupt himself. Such a threat and action taken to render it effective cannot be approved.

An order may be entered dismissing the bill, at complainant's costs.