## JEWELER'S CIRCULAR PUB. CO. v. KEYSTONE PUB. CO.

(Circuit Court of Appeals, Second Circuit.   February 6, 1922.) ·

No. 188.

1. **Copyrights ⬨5—"Directory" of trade-marks can be copyrighted.**
   A compilation of the trade-marks of the various firms engaged in the jewelry and allied trades is a directory, which is not limited to a list of the inhabitants of a city, town, etc., which may be copyrighted under Copyright Act March 4, 1909, § 5, subd. A (Comp. St. § 9521), authorizing copyright of books, including directories and other compilations.

2. **Copyrights ⬨5—Prohibition of copyrighted trade-marks does not prohibit copyright of compilation of trade-marks registered in Patent Office. ..... ..**
   The provision of Copyright Law June 18, 1874, that prints or labels designed to be used for any other article of manufacture shall not be entered under the Copyright Law, but may be registered in the Patent Office, which was not repealed by Copyright Act March 4, 1909 (Comp. St. §§ 9517–9524, 9530–9584), does not prohibit copyright of a directory or compilation of the several trade-marks used by persons and firms engaged in jewelry and allied trades.

3. **Copyrights ⬨16—Literary skill or originality is not necessary for copyright.**
   The right to copyright a book on which one has expended labor does not depend on whether the materials which he has collected consist of matters which are publici juris, or whether such materials show literary skill or originality, either in thought or in language, or anything more than industrious collection.

4. **Copyrights ⬨59—Subsequent compiler cannot use copyrighted compilation of trade-marks to save work of independent compilation or classification.**
   A subsequent compiler of a directory or compilation cannot make use of a copyrighted compilation, for the purpose of saving himself labor of making an independent selection or classification. .

5. **Copyrights ⬨83—Evidence held to show infringement of copyrighted directory of trade-marks.**
   Evidence that defendant's compilation of trade-marks of individuals and firms engaged in the jewelry business followed ˙the same classification as plaintiff's copyrighted compilation, reproduced errors in plaintiff's compilation, and disclosed similarity in arrangement and language, *held* to show defendant had infringed plaintiff's copyright, by copying the material from his compilation, instead of going to the original sources.

6. **Copyrights ⬨53—Copying matter is test of infringement of "copyright."**
   The correct definition of a copyright is the sole right of multiplying copies, which means that copyrighted matter must not be copied.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Copyright.]

Hough, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity for infringement of a copyright by the Jeweler's Circular Publishing Company against the Keystone Publishing Company. Decree for plaintiff (274 Fed. 932), and defendant appeals.   Affirmed.

Certiorari denied 258 U. S. ——, 42 Sup. Ct. 464, 66 L. Ed. ——.

Olney & Comstock, of New York City (Robert C. Beatty, of New York City, of counsel), for appellant.

W. H. Swenarton, of New York City, for appellee.

⬨For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This suit is brought to restrain the infringement of copyright No. 391,804, granted to the plaintiff, dated February 15, 1915, for a compilation entitled "Trade-Marks of the Jewelry and Kindred Trades." It is alleged to be infringed by the defendant's publication entitled "The Jewelers' Index," published in October, 1920. The plaintiff's publication is sold generally to the jewelry and kindred trades at the price of $5 a copy, and some thousands of copies have been so sold in such trades. The defendant's publication, on the other hand, is distributed without charge to the same trades. It has printed on the cover:

"This Index is loaned, not sold. It remains the property of the Keystone Publishing Company, and must be returned in order to receive the new edition."

It contains 610 pages, and is a larger volume than the plaintiff's, which only contains 326 pages. It is alleged that this fact has already undermined, and will undermine, unless restrained, the sale of the plaintiff's publication, and will destroy the market for any new supplements or new editions thereof, as well as irreparably injure the good will and reputation which the plaintiff has acquired over a period of more than half a century with its advertisers and customers.

The complaint alleges that the defendant, in preparing, compiling, and printing its book, entitled "The Jewelers' Index," has, as a substitute for and in lieu of a resort to original sources, unfairly used and pirated the results of the plaintiff's labor and expenditures, as set forth in the plaintiff's copyrighted book, and has incorporated such results in its (defendant's) publication, so that defendant's publication is to a very large extent the product of the plaintiff's original work, merely rewritten as to form, and with minor changes, omissions, and additions made by defendant, so as to conceal the fact that defendant's book was the product of the plaintiff's original work; that defendant, instead of resorting to original sources for illustrations and representations of marks, both registered and unregistered, and other important and useful information of interest to the jewelry and kindred trades, has to a very large extent obtained the same from the plaintiff's copyrighted book.

The answer denies that its book is an infringement of the plaintiff's book. It denies that it has unfairly used or pirated the results of the plaintiff's labor or expenditure as set forth in the plaintiff's copyrighted book, and it denies that it has incorporated such results in its publication, and denies that its publication is to any extent the product of the plaintiff's original work. It denies that, instead of resorting to original sources for illustrations or representations of trade-marks, registered or unregistered, or other important or useful information of interest to the trades, that it has to any extent obtained the same from the plaintiff's copyrighted book, and it denies that it has availed itself of any of the plaintiff's original work, and the defendant denies that it has published any of the plaintiff's original work as its own original work.

The court below has entered a decree holding the copyright valid and infringed. It directs that a perpetual injunction be issued enjoining the respondent from selling or distributing the Trade-Mark Section of the Jewelers' Index, published by it in October, 1920, or from printing, publishing, or vending of any other compilation of trade-marks which shall contain any fac simile or colorable copy or reproduction which shall be made from any trade-mark illustrations contained in the plaintiff's copyrighted book. The decree also contains the other usual provisions inserted in such decrees, and provides for an accounting and the payment of damages.

[1] The Century Dictionary defines a directory as:

"A book containing an alphabetical list of the inhabitants of a city, town, district, or the like, with their occupation, place of business, and abode."

That is one kind, and perhaps the most usual kind, of a directory, the one with which most people are familiar; but a city directory is not the sole kind of a directory. There are, among others, telephone directories, social directories, business directories, and trade-mark directories. The plaintiff's directory is a directory of trade-marks. It was first published and copyrighted in the year 1896. It has passed through several editions. The third edition, published and copyrighted in 1915, is the one involved in this suit.

It was at one time intimated in certain judicial opinions that directories were not entitled to copyright. But the law is now well established to the contrary in England. Kelly v. Hooper, 1 Y. & C. C. C. 197; Kelly v. Morris, L. R. 1 Eq. 696; Morris v. Ashbee, L. R. 7 Eq. 33; Lamb v. Evans, [1893] 1 Ch. Div. 218; Morris v. Wright, L. R. 5 Ch. A. 279. It is equally well-established law in this country. Trow Directory Printing & Book-Binding Co. v. Boyd (C. C.) 97 Fed. 586; Williams v. Smythe (C. C.) 110 Fed. 961; Trow Directory Co. v. United States Directory Co. (C. C.) 122 Fed. 191; Sampson & Murdock Co. v. Seaver-Radford Co., 140 Fed. 539, 72 C. C. A. 55; Hartford Printing Co. v. Hartford Directory & Publishing Co. (C. C.) 146 Fed. 332. And in Bleistein v. Donaldson Lithographing Co., 188 U. S. 239, 250, 23 Sup. Ct. 298, 47 L. Ed. 460, Mr. Justice Holmes, writing for the court, speaks of directories as being capable of copyright. Whatever doubt may have existed on the subject under the earlier acts, if any can be said to have existed, was ended by the action of Congress in enacting the Copyright Act of March 4, 1909 (Comp. St. §§ 9517–9524, 9530–9584), for section 5 of that act, in subdivision A (Comp. St. § 9521), in specifying the works in which copyright can be claimed, expressly names directories. Its language is:

"Books, including composite and cyclopedic works, directories, gazetteers, and other compilations."

The plaintiff's publication, being clearly a directory, was unquestionably copyrightable, and the plaintiff's copyright was a valid copyright. The fact is not material that it contains a compilation of trade-marks, and that a single trade-mark is not the subject of copyright.

[2] Error is assigned in overruling the following exception to the special master's report:

"(2) In that the special master has erroneously found that the plaintiff has a copyright upon illustrations of trade-marks published in its said book, whereas the Copyright Law of the United States forbids the copyright of such illustrations of trade-marks; it providing that 'no prints or labels designed to be used for any other article of manufacture shall be entered under the copyright law, but may be registered in the Patent Office.' U. S. Compiled Statutes, 1918, Compact Edition, § 9517a."

The Copyright Law of 1874 (18 Stat. 78, c. 301) provided as follows:

"The words 'engraving,' 'cut,' and 'print' shall be applied only to pictorial illustrations or works connected with the fine arts, and no prints or labels designed to be used for any other articles of manufacture shall be entered under the Copyright Law, but may be registered in the Patent Office."

The above provision of 1874 was not repealed by the Act of March 4, 1909, and it remained the duty of the Patent Office to register all prints which were required to be registered in that office under the act of 1874. See 28 Opinions of Attorney General, 116, 120.

But the question involved in this case does not arise under section 5, K, of the act of 1909, which recognized the right to copyright "prints and pictorial illustrations." If the trade-marks which are found in the plaintiff's book are not prints and pictorial illustrations, entitled to be copyrighted, but are such as are to be registered in the Patent Office, it is not decisive of the question involved herein. The court below assumed that the trade-marks contained in the plaintiff's publication, being designed for use on articles of manufacture, could not be copyrighted, but correctly regarded that fact as altogether immaterial.

The defendant insists that an illustration of a trade-mark, originated by another and the sole property of a manufacturer or jobber, is a mere copy of a mark having a set or standard form, and is not the subject of copyright. Any one who reproduces it is confined of necessity to the reproduction of the work of another. Such reproduction contains, he says, no elements of originality, and leaves no room for artistic treatment, and cannot be copyrighted. The defendant relies upon Royal Sales Co. v. Gaynor, 164 Fed. 207, in which the Circuit Court of the United States for the Southern District of New York held that the copyright of a book did not cover a monogram of a campaign badge described therein. In that opinion it was said that the validity of the copyright of the book was not questioned, but that "the monogram was not a 'cut, print or engraving,'" within the meaning of the only words of the copyright law at all appropriate to it, "because it was not a pictorial illustration 'connected with the fine arts,'" as required by the Copyright Act of June 18, 1874. That, however, was the case of a single print, and, if correctly decided, "does not touch this case."

But the Gaynor Case, in holding that the monogram was not a "cut, print or engraving," because it was not a pictorial illustration connected with the fine arts, may be difficult to reconcile with the decision in Bleistein v. Donaldson, 188 U. S. 239, 23 Sup. Ct. 298, 47 L. Ed. 460, to which it makes no reference. In the Bleistein Case the court, referring to the Copyright Act, said that the act provides that "in the construction of this act, the words 'engraving,' 'cut' and 'print' shall

be applied only to the pictorial illustrations or works connected with the fine arts," and added:

"We see no reason for taking the words 'connected with the fine arts' as qualifying anything except the word 'works.'"

The Gaynor Case also appears to be in conflict with J. H. White v. Shapiro (D. C.) 227 Fed. 957, Da Prato Statuary Co. v. Giuliani Statuary Co. (C. C.) 189 Fed. 90, and National Cloak & Suit Co. v. Kaufman (C. C.) 189 Fed. 215.

The defendant also relies upon J. L. Mott Iron Works v. Clow, 82 Fed. 316, 27 C. C. A. 250, decided by the Circuit Court of Appeals in the Seventh Circuit. The publication involved was a trade catalogue containing a collection of photographic illustrations of bathtubs, foot baths and other bathroom appliances. The court held it was not the subject of copyright, because it was an advertisement, and also because it was without æsthetic value. It is perhaps enough to say that that case was decided upon a line of reasoning which has been expressly rejected by the Supreme Court in a subsequent decision, to which we shall refer in a moment. The theory of that decision rested on the assumption that mere advertisements, whether by letter press or by picture, are not within the protection of the copyright law. But in Bleistein v. Donaldson, supra, the court, reversing the court below, held that chromolithographs used as advertisements of a circus were entitled to the protection of the copyright laws, and it declared that a picture is "none the less a subject of copyright that it is used for an advertisement." As respects the æsthetic argument the court said:

"If they [the pictures] command the interest of any public, they have a commercial value—it would be bold to say that they have not an æsthetic and educational value—and the taste of any public is not to be treated with contempt."

The case of Hamilton Mfg. Co. v. Tubbs Mfg. Co., 216 Fed. 401, is also relied upon. That case was decided in the Circuit Court for the Western District of Michigan, in 1908, and therefore prior to the adoption of the present Copyright Act. It appears to have been brought, not to restrain the violation of a copyright, but to restrain unfair competition and to protect trade secrets. It was declared that the fact that defendant, in making its catalogue, copied cuts and descriptive matter, relating to articles which it might sell, as well as complainant, from the complainant's catalogue, as well as from those of other manufacturers, did not entitle the complainant to an injunction. No reference is made in the opinion to the Bleistein Case. And for that matter we find no allusion to that case in the defendant's brief, although it submitted one containing 70 printed pages. As was pointed out in the master's report:

"A man's name, his occupation, his place of business, and his residence are none of them subjects of copyright."

But, if a man compiles a book containing such information about the residents of a particular place, he may, as we shall see, copyright it as a whole, notwithstanding the fact that the separate parts of which it is composed are not copyrightable. The plaintiff's work contains 1,250

trade-mark illustrations, and the fact that each one of them, taken alone, might not be copyrightable, fails to establish the proposition that, taken together, they may not be copyrighted. In Lamb v. Evans, supra, which was a case in the Court of Appeal, Lindley, L. J., said:

"I do not myself see the difficulty in a publisher's having a copyright in a sheet of advertisements. I do see a difficulty in his having a copyright in one advertisement, because, as Mr. Justice Chitty pointed out, that might prevent the advertiser from republishing his advertisement in another paper, which is absurd. But to say that it follows, from that, that the proprietor, say of the Times, has no copyright in a sheet of advertisement, so that he cannot restrain anybody from copying that sheet, appears to me a very different proposition."

Bowen, L. J., expressed the same opinion:

"It is perfectly true that each separate advertisement may not have become in its separate form, as a distinct entity, the copyright of the plaintiff; but he still might have a copyright in respect of the collocation and concatenation of the advertisements, just as, I believe, the proprietors of the Times would have copyright in a sheet of advertisements."

And Kay, L. J., appeared to share in the opinion thus expressed.

[3] The right to copyright a book upon which one has expended labor in its preparation does not depend upon whether the materials which he has collected consist or not of matters which are publici juris, or whether such materials show literary skill or originality, either in thought or in language, or anything more than industrious collection. The man who goes through the streets of a town and puts down the names of each of the inhabitants, with their occupations and their street number, acquires material of which he is the author. He produces by his labor a meritorious composition, in which he may obtain a copyright, and thus obtain the exclusive right of multiplying copies of his work.

An excellent illustration is afforded by the decision of the House of Lords in Walters v. Lane, L. R. [1900] A. C. 539. In that case the House of Lords held that a reporter, who took down in shorthand speeches delivered by Lord Roseberry on public occasion and published them in a volume, was entitled to a copyright in them. In his opinion in the Walters Case Lord Chancellor Halsbury thought the case analogous to that of the maker of a directory:

"If the producer of such a book can be an author within the meaning of the act, I am unable to understand why the labor of reproducing spoken words into writing or print, and first publishing it as a book, does not make the person who has so acted as much an author as the person who writes down the names and addresses of the persons who live in a particular street."

In 1866 in Kelly v. Morris, supra, which was the first of the English directory cases, the then Vice Chancellor Wood, who subsequently became Lord Chancellor Hatherly, said (page 701):

"The defendant has been most completely mistaken in what he assumes to be his right to deal with the labor and property of owners. In the case of a dictionary, map, guidebook, or directory, when there are certain common objects of information which must, if described correctly, be described in the same words, a subsequent compiler is bound to set about doing for himself that which the first compiler has done. In case of a roadbook, he must count the milestones for himself. In the case of a map of a newly discover-

ed island (the illustration put by Mr. Daniel), he must go through the whole process of triangulation, just as if he had never seen any former map, and generally he is not entitled to take one word of information previously published, without independently working out the matter for himself, so as to arrive at the same result from the same common sources of information, and the only use that he can legitimately make of a previous publication is to verify his own calculations and results when obtained. So in the present case the defendant could not take a single line of the plaintiff's directory for the purpose of saving himself labor and trouble in getting his information. The defendant, from his description of the way in which he had in the first instance compiled his 'Business Directory' seems to have known exactly what he might do. No doubt the expense of procuring information in a legitimate way is very great. The defendant himself has told us so, and also that it was not for some years that he was able to make it pay. But the defendant goes on in his affidavit to propound a most extraordinary doctrine as to the right of publicity in the names of private residents, who had, as he expressed it, 'given their names for public use.' What he has done has been just to copy the plaintiff's book, and then to send out canvassers to see if the information so copied was correct. If the canvassers did not find the occupier of the house at home, or could get no answer from him, then the information copied from the plaintiff's book was reprinted bodily, as if it was a question for the occupier of the house merely, and not for the compiler of the previous directory. Further than this, the defendant tells us that he had a number of new agents, and that one of them had performed his part of the work carelessly, thus at once showing how easy it would be, on the system adopted by the defendant, for any negligent agent to send back his list all ticked as if correct, without having taken the trouble to make a single inquiry."

In Morris v. Ashbee, supra, an injunction was obtained by the publisher of "The Business Directory of London" against the publisher of a somewhat similar directory. It was held that the directory had been infringed, in so far as the compilation and arrangement of the advertisements and names of traders were taken from the plaintiff's directory. Vice Chancellor Giffard, citing Kelly v. Morris, said (page 40):

"In a case such as this, no one has a right to take the results of the labor and expense incurred by another for the purpose of a rival publication, and thereby save himself the expense and labor of working out and arriving at these results by some independent road. If this was not so, there would be practically no copyright in such a work as a directory. Moreover, it is not necessary for me to define the extent to which the defendants might have gone, or may go, in using the plaintiff's directory. What I have to determine is whether they could lawfully do what they actually did. Now it is plain that it could not be lawful for the defendants simply to cut the slips which they have cut from the plaintiff's directory and insert them in theirs. Can it, then, be lawful to do so because, in addition to doing this, they sent persons with the slips to ascertain their correctness? I say, clearly not. Then, again, would their acts be rendered lawful because they got payment and authority for the insertion of the names from each individual whose names appeared in the slips? And to this I again answer, clearly not. The simple upshot of the whole case is that the plaintiff's directory was the source from which they compiled very material parts of theirs, and they had no right so to resort to that source. They had no right to make the results arrived at by the plaintiff the foundation of their work, or any material part of it; and this they have done."

The correctness of the rule laid down in the above cases has been recognized in the subsequent English decisions. Morris v. Wright, supra; Scott v. Stanford, L. R. 3 Eq. 718; Cox v. Land and Water Journal Co. 9 Eq. 324; Pike v. Nicholas, L. R. 5 Ch. 251; Hogg v.

Scott, L. R. 18 Eq. 444. In Morris v. Wright, supra, the Vice Chancellor reviews Kelly v. Morris, supra, and Morris v. Ashbee, supra, respecting the law as to directories, and says that in these cases the infringers had virtually and bodily copied from the prior book:

"They had copied from the very slip, and all they had done was to take the slip and verify it, and nothing else. In the late case of Pike v. Nicholas, supra, we had this: Two rival works were published with reference to the same subject-matter, and we thought certainly that the defendant had been guided by the plaintiff's book more or less to the authorities which the plaintiff had cited; but it was a perfectly legitimate course for the defendant to refer to the plaintiff's book, and if, taking that book as his guide, he went to the original authorities and compiled his book from them, he made no unfair or improper use of the plaintiff's book; and so here, if the fact be that Mr. Wright used the plaintiff's book in order to guide himself to the persons on whom it would be worth his while to call, and for no other purpose, he made a perfectly legitimate use of the plaintiff's book."

Counsel for defendant appear to attach great importance to the case of Moffat v. Gill, 86 Law Times, 465. They speak of "the rule" laid down in that case, and which they profess to find in the following passage:

"You cannot, where another man has compiled a directory, simply take his sheets and reprint them in your own. You are entitled, taking the sheets with you, to go and see whether the existing facts concur with the description in the sheets, and, if you do that, you may publish the result as your own."

And in the same connection counsel refer to the fact that this court in Edward Thompson Co. v. American Law Book Co., 122 Fed. 922, 924, 59 C. C. A. 148, 62 L. R. A. 607, quoted the above passage in the opinion then rendered. Moffat v. Gill was decided by the English Court of Appeal in 1902. It was not a case relating to directories, and what was said on that subject appears in the opinion pronounced by one of the three judges, each of whom stated his opinion. The question which the case decided was that the defendant, who had published an annotated edition of one of Shakespeare's plays, had infringed an annotated edition of the same play published by the plaintiff. In the course of his opinion the Master of the Rolls said:

"But counsel justified annexing another man's quotations on the ground that you may follow an indication given in another book as to the place where you will find authorities; that you have the right to consult them, and that all the defendant Mr. Marshall does, being directed by a reference to a particular quotation, is to go and look to the author, and see whether the quotation corresponds with the text, and, if so, the text being common property, he is at liberty to annex that quotation. I cannot admit that for a moment. He rather suggested that it was justified by the cases relating to directories, which say that, though you cannot, where another man has compiled a directory, simply take his sheets and reprint them as your own, you are entitled, taking the sheets with you, to go and see whether the existing facts concur with the description in the sheets, and if you do that you may publish the result as your own. Certainly; but are you at liberty to apply the same principle to a series of quotations. * * *"

We do not understand from the passage quoted that the Court of Appeal was in that summary fashion undertaking to overrule somewhat elaborate and carefully considered decisions on the subject of the copyright of directories, and was doing so without mentioning the

decision, and in a case dealing with a totally different kind of publication. Moreover, if in the publication of a directory giving the names of all the inhabitants of a place, with the street and number where each person resides, another, who simply takes the sheets and goes and sees for himself whether the facts concur with the statements in the sheets and publishes the results, without copying from the sheets, he does what the English courts have recognized his right to do. In so doing he has not taken one word of the information previously published without independently working out the matter for himself, and he arrived at the same result from the same common sources of information. And this the cases say he legitimately can do, so long as he does "not take a single line of the plaintiff's directory for the purpose of saving himself labor and trouble in getting his information."

The law in this country seems to be fairly in accord with the rules laid down in England. The English cases of Kelly v. Morris, supra, of Morris v. Ashbee, supra, and Morris v. Wright, supra, are referred to approvingly by the Supreme Court in International News Service v. Associated Press, 248 U. S. 215, 244, 39 Sup. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293. In Edward Thompson Co. v. American Law Book Co., 122 Fed. 922, 59 C. C. A. 148, 62 L. R. A. 607, decided by this court in 1903, the complainant, who was the publisher of two encyclopædias, claimed that the defendant, who was the publisher of another encyclopædia, infringed its copyright. The act of the defendant which was complained of was that it put into the hands of its editor lists of all the cases bearing upon a given subject, including the cases found in complainant's books. The list of complainant's cases contained authorities not found in the digests. The original reports were examined by the editor, and if the cases were found applicable they were cited by him in support of his article; if not, they were rejected. It was not pretended that a word of the complainant's text was copied. Indeed, the defendant did not permit any of its editors to open the complainant's books. The only use made of the list of the cases furnished was as a guide to the volumes where the cases were reported. The court stated the question presented as follows:

"Is a copyrighted law book infringed by a subsequent work on the same subject, where the only accusation against the second author is that he collected all available citations, including those found in the copyrighted work, and, after examining them in text-books and reports, used those which he considered applicable to support his own original text?"

The court held that the question should be answered in the negative. To hold otherwise, it was said, would extend the law of copyright beyond its present bounds.

In West Publishing Co. v. Edward Thompson Co., 176 Fed. 833, 100 C. C. A. 303, decided by this court in 1910, the publisher of the Federal and other Reporters charged the publisher of an Encyclopædia of Law with an infringement of its copyright. The court below dismissed the bill, but this court modified the decree by the direction to refer the cause to a master to determine the amount of the damages sustained. We held that the copying or paraphrasing of the syllabi from a copyrighted report of law cases by a subsequent publisher of

a similar report or a digest constituted an infringement of the copyright, whether by so doing he saved literary work or merely mechanical labor. At the same time the court said that a writer of a law textbook might use a copyrighted digest of decisions, and might copy lists of cases therefrom, to assist him in running down the cases, and that such use was a fair one, and within the purpose for which the digest was sold.

[4] The right of a publisher of a subsequent directory to use material in a prior directory came before Judge Wallace in the Circuit Court for the Southern District of New York in List Publishing Co. v. Keller, 30 Fed. 772, decided in 1887. The rival publications in that case were "society" directories purporting to give the names of those persons in New York City who were supposed to be people of fashion. The complainant claimed that its copyrighted directory, "The List," was infringed by defendant's directory, the "Social Register," and asked for an injunction. The complainant was held entitled to the injunction. Judge Wallace stated the rule laid down in Morris v. Wright, heretofore quoted. He then said:

"It is not necessary to adopt this statement unqualifiedly, but it is safe to say that the compiler of a general directory is not at liberty to copy any part, however small, of a previous directory, to save himself the trouble of collecting the materials from original sources. Otherwise, as the matter of rival publications of this kind is identical, there would be practically no copyright in such a book. It is not necessary or reasonable to apply so strict a rule to publications like the present. They are designed to provide a catalogue, in convenient form, of the names and addresses of a selected class of eligible persons. They are original to the extent that the selection is original. Their commercial value depends upon the judgment and knowledge of the author respecting the social standing and society relations of a limited class of the general public. When the selection is made, each compiler must of necessity reproduce the same names and addresses, so far as the selections coincide, and must arrange them in alphabetical order. The law of copyright only requires the subsequent compiler to do for himself that which the first compiler has done. The same sources of original information are open to each. Either of the present parties could lawfully use the general city directory to obtain the correct addresses of the selected persons; nor is it doubted that the defendant had the right to use the complainant's book for the purpose of verifying the orthography of the names, or the correctness of the addresses, of the persons selected. But if the defendant has used the List to save himself the trouble of making an independent selection or classification of the persons whose names appear in the Social Register, although he may have done so only to a very limited extent, he has infringed the complainant's copyright."

The conclusion we have reached, and it was the conclusion of the special master and evidently concurred in by the District Judge, is that the doctrine announced by Judge Wallace in the List Case states the rule to be applied in the case of a trade directory, such as the one which the defendant is alleged to have infringed. Tested by that rule, the defendant has infringed.

In Sampson & Murdock Co. v. Seaver-Radford Co., 140 Fed. 539, 72 C. C. A. 55, decided by the Circuit Court of Appeals in the First Circuit, the suit was brought by the publisher of a directory of the city of Boston against the publisher of a similar directory published in the following year, on the ground that the second publication infringed

the copyright of the first. It appeared that the defendant, after completing its original canvass for names, had copied on slips from complainant's directory such names there printed as it had not obtained in its own canvass, with the information given about them, and with such slips as a guide verified them by sending canvassers to the addresses given therein, and, when found correct, reprinted the same without alteration in its own directory. This was held to be an infringement.

[5] We come now to the facts relied upon to make out infringement. We think the record is full of the most persuasive evidence of the flagrant infringement by the defendant of the plaintiff's copyright work. The evidence is very fully stated by the master in his report and in his appendix thereto. He states that he has "a very strong impression that the plaintiff's book was not used, as such books have so frequently been used, to locate the names of persons in the trade, who might have been overlooked by defendant's canvasser's." The defendant used clippings from the plaintiff's book. He cut the pictures of the trademarks from the plaintiff's book, and sent them to the persons or firms whose trade-marks they purported to be, and inquired whether they were correct. The master in his report says:

"From what has been set forth above, and what is found in the Appendix, the conclusion is reached that down to March 26, 1920, there had been no real effort to collect, at its source, the trade-mark information necessary for an Index such as defendant's; that to collect such information at first hand by independent and persistent inquiry of the owners of the marks would have involved much time and trouble on the part of those selected to collect it, and that, when collected in the form in which it existed at the source, much of it would require still more time and trouble to put it in such shape that individual designs could be transferred to the surface of the metal plate. Such work had been done in the preparation of plaintiff's book. The first real independent effort of defendant, at the common source of information, was to exhibit the result of plaintiff's work and in substance to ask if such result was correct. An affirmative answer would enable defendant to prepare its cut, without the doing of a substantial amount of work, which plaintiff had done."

The record is full of instances in which the defendant has simply copied the trade-mark illustrations which it found in plaintiff's work, using the clipping to produce the cut from which the mark is printed in the infringing book. That in itself makes out the infringement complained of. But that is not all. The evidence also shows the following facts, which plainly indicate the further use which the defendant made of the plaintiff's book:

(1) That there are numerous instances where manufacturers furnished defendant with additional information regarding their trade-marks, or mentioned additional marks which they were then using, or referred to a different classification from that in which they appeared in the plaintiff's book, all of which information the defendant disregarded, and copied into his book just the information which appeared in the plaintiff's book.

(2) That in a large number of cases defendant has reproduced in his book the trade-marks of manufacturers which appear in the plaintiff's book, although no one representing the defendant ever called or solicited from such manufacturers any trade-mark information what-

ever, although these manufacturers were within easy access and in communities or neighborhoods as to which communities defendant's representatives testified they had canvassed, so that it would have been possible to call upon them, if it had been the intention of defendant to make a canvass of the original sources for trade-mark information.

(3) That in a number of instances addresses are given as they appear in the plaintiff's book, although the addresses were wrong at the time the defendant began the work of compilation on its book, owing to removals from one place of business to another.

(4) That in a number of instances, in which the names of manufacturers appear in the plaintiff's book out of alphabetical order, the same names appear out of alphabetical order in the defendant's book.

(5) That in a number of instances names of manufacturers appearing in the plaintiff's book are reproduced in the defendant's book, although prior to the compilation of the latter such manufacturers had gone out of business.

(6) That in a number of instances the defendant has published in his book old firm names, followed by present firm names and by the word "successors," although the predecessors had been out of business for many years. An illustration is found in the following, which appears in the defendant's book: "Cutler & Granberry Succeeded by J. A. & S. W. Granberry." This is exactly as it appeared in the plaintiff's book, and it is the only instance in the defendant's book in which the words "succeeded by" appear. In all other instances the word "successors" is used, as where it is used by the plaintiff.

(7) That the cases where the plaintiff in its book has misspelled or inverted the names of the manufacturers the same mistake has been made in defendant's publication; as "Champenios & Co." instead of "Champenois & Co.," and "O. C. Delong" instead of "O. C. De Long."

(8) The production in the infringing book of identical groups of trade-mark illustrations, showing identically the same position and the same spacing between each individual illustration, and also between columns of illustrations.

(9) The first half of the classifications adopted by the defendant in its book, though arbitrary, are almost identical in name and order of succession with the classifications which the plaintiff used in its book.

The plaintiff insists, and we agree in that view of the matter, that it is almost impossible to conceive of two individuals working independently and arriving at practically the same classification. Not only is it almost inconceivable that two individuals would arrive at the same classification, but it is certainly more than a coincidence, particularly where there are so many possible combinations, and where it is shown that the trade arranges these groups in so many different ways, that they should arrange the principal classes practically in the same order, without one copying the work of the other.

[6] It thus appears beyond any manner of doubt that defendant has infringed upon the plaintiff's copyright. The correct definition of copyright is that given by Lord Cranworth in Jefferys v. Boosey, 4 H. L. C. 815, where he said that the true definition of "copyright" is the sole right of multiplying copies. That means that you must not copy mat-

ter copyrighted. No one can legally take the results of the labor and expense which another has incurred in the publishing of his work, and thereby save himself "the expense and labor of working out and arriving at those results by some independent road." The defendant undertook to save himself the labor and expense of arriving at his results by an independent road.

The record is full of instances of the defendant's copying. As to the proof of the fact as found in the copying of blunders we content ourselves with quoting from the leading case of Lawrence v. Dana, 4 Cliff. 1, 15 Fed. Cas. 57, No. 8,136, in which Mr. Justice Clifford, speaking of the presumption arising from identity of inaccuracies, said:

> "Instances quite numerous are also given where clerical and typographical errors and peculiarities, including special translations, are reproduced in the edition prepared by the respondent, and the court is reminded in argument that cases have arisen where the strongest proof of copying consisted 'in the coincidence of errors.' Jeremy, Eq. Jur. 322. Where the question is whether the defendant, in preparing his book, had before him and copied or imitated the book of the plaintiff, it is manifest, says Mr. Curtis, that this kind of evidence is the strongest proof, short of direct evidence, of which the fact is capable. Curt. Copyr. 255; Murray v. Bogue, 1 Drew. 367; Spiers v. Brown, 6 Wkly. Rep. 353. Other authorities may be cited where the presumption arising from the identity of inaccuracies is carried much further, and where it is held that, when a considerable number of passages are proved to have been copied by the copying of the blunders in them, other passages which are the same with passages in the original book must be presumed, prima facie, to be likewise copied. though no blunders occur in them. Mawman v. Tegg, 2 Russ. 394; Longman v. Winchester, 16 Ves. 269."

In Callaghan v. Myers, 128 U. S. 617, 662, 9 Sup. Ct. 177, 32 L. Ed. 547, which was a suit brought by the publishers of Freeman's Illinois Reports for the infringement of the copyright, Mr. Justice Blatchford, writing for the court and speaking as to the similarities existing between the infringing and infringed editions, says:

> "It may be added that one of the most significant evidences of infringement exists frequently in the defendant's volumes, namely, the copying of errors made by Mr. Freeman."

And in Frank Shepard Co. v. Zachary P. Taylor Publishing Co., 193 Fed. 991, 993, 113 C. C. A. 609, this court declared that the proof of a considerable number of errors common to the plaintiff's infringed and defendant's alleged infringing publications created a prima facie case of copying by the defendant which it was bound to explain; and it was added:

> "The inference from the unfair use of the complainant's work in these instances of erroneous citations is that it was similarly used as to the correct citations to an extent that cannot be determined."

Decree affirmed.

HOUGH, Circuit Judge. I dissent from what may be called the practical or business result of this case. The litigation is a trivial pother between two advertisers, and on the facts might well have been relegated to law, where, as plaintiff received no provable damage, no case would have resulted.

I dissent from the treatment of trade-marks in their relation to copyright. If (as is true) John Doe cannot copyright his own trade-mark, he evidently cannot copyright a thousand other trade-marks belonging to as many other owners. Nor is this truth avoided by the fact that he calls his list of trade-mark reproductions a directory, nor by the additional further fact that he can copy a directory.

Assuming now (what no one doubts) that Doe can copyright a directory, digest, or compendium of matters and things in themselves incapable of copyright, what is such copyright worth? Nothing at all, as a copyrighting per se of such things as trade-marks; but it does protect the selection, ordering, and arrangement of the pictured or printed material; and infringement of such copyright consists, and consists only, in the copying of a material part of such selection, etc. In this case there was no such material copying.

I dissent, also, from the treatment of certain prior decisions of this court. In Thompson Co. v. American, etc., Co., 122 Fed. 922, 59 C. C. A. 148, 62 L. R. A. 607, and West, etc., Co. v. Thompson Co., 176 Fed. 833, 100 C. C. A. 303, we held very directly that what is here called "slipping" was a legitimate use of any publication of the directory, digest, or compendium variety. The trade-word "slipping" means cutting out of (say) plaintiff's directory, parts or "slips" giving the facts about some one man or thing or matter, and using such "slips" as guides for going even to the same original sources to obtain or verify the same facts for reproduction in (say) defendant's rival publication. But the practice was as plainly condemned in Sampson, etc., Co. v. Seaver, 140 Fed. 539, 72 C. C. A. 55, a decision of the First Circuit. The two lines of opinion cannot be used to uphold the judgment herein, although the endeavor seems to me to be made in the majority opinion. I adhere to the previous judgments of this court.

The full measure of this defendant's offending was and is that, through the laziness or incompetence of subordinates, there exist a few instances of the use by defendant of the "slip" material without investigation, correction, or original effort of any kind. The matter is so trivial that, even assuming that equity was justified in giving some decree, it shocks fairness to award such extreme penalties as were meted out here.

I further dissent from the treatment of three specified trade-marks, drawings of which plaintiff had inserted in its directory. Defendant submitted "slips" showing these trade-marks to the several proprietors thereof, whereupon said proprietors themselves made reproductions of their own marks and sent the cuts or dies of the same to the defendant, authorizing their insertion in defendant's publication. In respect of these three printings of trade-marks the master refused to find infringement; but on exceptions by plaintiff the District Court overruled the master, and held the acts above set forth constituted infringement. It then entered the decree appealed from here, in which it substantially defines the infringement in the following words, viz.:

That defendant be enjoined "from printing, publishing, or vending of any compilation of trade-marks which shall contain any fac simile or colorable copy or reproduction which shall be made from any trade-mark illustrations contained in the plaintiff's said copyrighted book."

I think this was plain error of law, in that it gave to an advertising trade list maker a proprietary interest in whatever trade-mark he chose to list. It makes the trade-mark owner, who thereafter reproduces his own trade-mark (using plaintiff's book for copy) an infringer; and so much was triumphantly asserted at bar on behalf of the appellee.

To all this I do not agree, and think it such error as should require reversal of the decree and remand of the case, with direction to enter a new decree in accordance with law and more consonant with the justice of what is essentially no more than an advertising row of no importance.