## DIXIE VORTEX CO. v. LILY–TULIP CUP CORPORATION.

### No. 7397.

District Court, E. D. New York.

May 26, 1937.

512

Edmund Quincy Moses, of New York City (Joseph H. Milans, of Washington, D. C., and Edmund Quincy Moses, of New York City, of counsel), for plaintiff.

Briesen & Schrenk, of New York City (Hans V. Briesen, Fred A. Klein, and S. Mortimer Ward, Jr., all of New York City, of counsel), for defendant.

GALSTON, District Judge.

This action relates to the alleged infringements of letters patent No. 1,766,420, issued to the Individual Drinking Cup Company, Inc., of Pennsylvania, on the application of Wessman and Stone, for a paper cup making machine; of letters patent Nos. 1,256,913 and 1,336,469, both issued to the Individual Drinking Cup Company, Inc., of New York, on the applications of L. W. Luellen, for cup containers or dispensing apparatus; of design patent No. 74,793 for a paper cup or similar article, issued to the Individual Drinking Cup Company, Inc., of Pennsylvania, on the application of Joseph Johnson; of trademark No. 301,390 for the name "Chily-Bear"; of copyright print No. 16,169; and alleges also unfair competition. Thus there are presented seven causes of action which will be discussed in the order indicated.

Wessman & Stone Patent,
No. 1,766,420.

This patent was issued June 24, 1930, for a paper cup making machine. There are fifty pages of specification and claims, and thirty-two sheets of drawings, but it was not found necessary in the presentation of the proofs to consider all of the detail disclosed. Of the 171 claims the following are in issue: Nos. 76, 77, 89, 101, 102, 104, 107, 108, 109, 110, 111, 114, 142, 143, 144, 147, 149, 150, 151, 152, 153, 154, 155, 156, 164, and 165.

The paper cup for drinking purposes has been for over twenty years a commodity of recognized utility. With sanitary objective, its introduction was to displace tin or other metal cups used in public places, so as to provide cups for individual and single use. Increasing demand necessitated large production at a low cost.

Two contrasting forms were known to the art; the flat envelope type, and the relatively rigid cylindrical form of cup. To facilitate a wide distribution for packages and shipment, as well as for ready delivery from dispensers, it was important to make the cylindrical cup of thin material.

In carrying out this invention, Wessman and Stone designed a machine to produce a complete cup without previously cutting the blanks therefor. The specification states: "In other words, a machine which will take the rolls of paper from which the cups are to be formed and by continuous operation form a complete cup

having a cylindrical body or wall portion and a bottom secured therein."

This machine comprises means for supporting two rolls of paper, one adapted to be cut for forming the body portion, the other for forming the bottom of the cup. The machine makes use of revolving turrets. Three of these are provided. The cut body blanks are delivered to the first revolving turret which carries them into position beneath tapered forming mandrels, carried by the second revolving turret. Previous to positioning the body blank beneath the forming mandrel, one of the bottom blanks is to be drawn or formed over the end of the forming mandrel and is to be held thereon by suction.

Mechanism is provided to position the body blank around the forming mandrel; the body blank is secured to the bottom blank by adhesive which has been applied to the body blank during the rotation of the first turret. The longitudinal edges of the body blank are held together by a line of adhesive also applied during the rotation of the first turret. Means are provided on the second turret "to strike the cup formed on the mandrel a sharp blow over the longitudinal line of adhesive so as to imbed the adhesive into the fibers of the paper to form a secure seal."

The cup is brought into line with a mechanism for rolling the bottom edge of the body beneath the bottom blank and, as the second turret continues to revolve, it brings the forming mandrel containing the cup adjacent to the upper end of a chute which extends over female dies carried by the third revolving turret. The cup is then blown from the mandrel to one of the female forming dies of the third turret. Then the third turret, as it revolves, brings the cup in position beneath a male die member, the object of which is to flange or curl the upper edge of the cup. After this operation, further rotation of the third turret brings the cup in line beneath a chute, and the cup is again blown from the female die of this turret and discharged through the chute into a package or to a conveyor which carries the cups to a receptacle from which they may be removed.

The inventors conclude their description of the machine and its operation with the following statement: "We wish to again lay particular stress on the fact that with a machine such as described a cup which is formed from a plurality of parts is manufactured from what may be termed raw material in the form of strips of paper the parts making up the cup being formed into the desired shape and then secured together by a continuous operation of the machine."

The patent is attacked on many grounds, among others that the various instrumentalities for performing any and all of the operations required to make a two piece cup were well known in the art and that all of these instrumentalities were open to the defendant. It is urged that the patent in suit presents no real combination; that its claims should be interpreted as reciting but mere aggregations.

The Wessman & Stone machine is of undoubted utility and, despite the fact that the defendant adduces a number of prior art patents, there is no one that anticipates the patent in suit.

Defendant's expert Ray was asked:

"XQ585. You wouldn't say that any one of those patents discloses a machine organized in the way in which the machine of the Wessman and Stone patent is organized? A. No, Wessman and Stone have arranged the various instrumentalities in a somewhat different manner from any other patent."

However, infringement is vigorously denied. The defendant says its machine is assembled from the prior art and follows particularly the Cooley patent No. 1,199,160; and also is somwhat modeled on the Thompson patent No. 945,875, Luellen patent No. 1,273,891, Regan patent No. 187,388, Whitney patent No. 1,082,836, Luellen & Wessman patent No. 1,365,517, Carle patent No. 1,429,324, and J. M. Taylor patent No. 1,077,496.

Granting that each and every element of the defendant's machine can be traced to these several patents; if the assemblage falls within any valid claim of the Stone & Wessman patent, under most elementary patent law the defendant cannot escape infringement.

The claims in suit permit of a certain grouping. Claims 89, 101, 102, 104, 107–111, 114, 142, 143, 144, and 151 may thus be considered together. Claim 89 reads: "In a machine for making paper cups or the like, a mandrel, means for shaping a bottom on the mandrel, means for shaping a body on the mandrel around the shaped bottom and securing the same to the bottom, means for clamping the body on

the mandrel, and means for curling the bottom edge of the body without effecting the previously shaped bottom."

It is to be noted that this claim provides means for shaping a bottom blank on the mandrel. In the defendant's machine, as in the E. Z. Taylor patent, the bottom blank is formed independently of the mandrel and is, as thus formed, pushed into the complete body portion beyond the body forming station. This departure from the structure and operation of the plaintiff's machine avoids infringement.

Similar limitations are found in claims 101, 102, 104, 107, 108, 109, 110, 111, 114, 142, 143, 144, and 151, and, therefore, these claims likewise are not infringed.

I cannot agree, however, with the defendant's contention that claims 76 and 77 include the same limitation. In these claims reference is made to means for forming a body and means for forming and securing a body around the bottom. It would seem that the language is sufficiently broad to cover the instrumentalities employed by the defendant. It is true that in the defendant's machine the bottom is formed separately of the body and slides into position, but in terms at least the defendant's machine has "means for forming a bottom and means for forming and securing a body around the bottom." Whether the defendant's machine has "means for curling the bottom edge of the body without effecting the previously shaped bottom," within the meaning of the terminology and the fair intent of the specification, raises a matter which was discussed at great length at the trial. The defendant urged that it has not means for curling the bottom edge of the body; that what it does consists in bending the body edge against the bottom flange and then ironing out these associated parts into a three-ply structure. It is argued that such is not a "curling" operation. The distinction is tenuous, if indeed there is a distinction at all. Clearly, too, defendant's operation is carried out "without effecting the previously shaped bottom." Despite, therefore, the fact that the defendant's machine employs different instrumentalities for bending and ironing the associated edges, it does employ all the means broadly stated in these two claims. Accordingly, I think these claims are infringed.

Claims 164 and 165 include means applying divergent lines of paste on the body blank to secure the edges thereof together and the bottom thereto. Claim 164 defines the mechanism as comprising a pair of adjacent paste applicators and means for actuating them without interference of one with the other. In claim 165, the one paste applicator is defined as engaging the blank prior to its presentation to the mandrel and means whereby the paste applicator will apply a line of paste on the blank in an arc concentric to the arc of the lower edge of the blank.

The mechanism for applying the glue is described on pages 10 and 11 of the patent. Lines or bands of glue are applied adjacent to the concave longitudinal edge of the blank and a transversally extending line or band is applied adjacent to one end of the blank.

In the defendant's machine a printing ruler is used for the pasting or gluing operation. The lines of glue are at an angle to each other.

The mechanism for applying the adhesive in the defendant's machine is substantially that described in the Cooley patent. There is no doubt that the defendant applies two paste lines to the body blank, but the mechanism for so doing is not that of the patent. I do not find that the defendant's structure includes "a pair of adjacent paste applicators" as set forth in claim 164.

As to claim 165, provision is made for "means for treating the body blank, so that the bottom and body will be secured together, comprising a paste applicator adapted to engage the blank prior to its presentation to the mandrel and means whereby the paste applicator will apply a line of paste on the blank in an arc concentric to the arc of the lower edge of the blank which is to encompass the bottom."

The defendant says it avoids infringement because the way in which it lays a line of glue was old in such patents as Marks, Ball, Davidson, and Swift. Undoubtedly, if the only matter in issue were whether the gluing operation defined in this claim was claimed as an invention by and of itself, there is sufficient in the prior art soundly to urge that no invention was involved. But what seems to be overlooked in the defendant's argument is that the means for performing the gluing

operation are but part of the other means described in a machine for forming paper cups. The mere inclusion of an old element with other old elements does not of itself create doubt as to the validity of this claim. The claim is not anticipated and is valid, and is sufficiently broad in scope to include the defendant's machine.

The clamping mechanism referred to in claim 147 is limited by the provision of "connecting means for relatively effecting the actuation of the clamping and turning mechanism." The relative movement referred to between the clamping and the curling mechanism is not employed by the defendant. Accordingly I find no infringement of claim 147.

Claims 149 and 150 read as follows:

"149. The combination of a cup supporting mandrel having an apertured portion, means for creating a jet of air through said apertured portion to assist in releasing a cup from the mandrel and blowing the same from the mandrel and other means for delivering a jet of air into the open end of the cup between the same and the mandrel to overcome any back or holding current of air working· rearwardly between the mandrel and cup from said first mentioned jet.

"150. The combination of a cup supporting mandrel having an apertured portion, means for creating a jet of air through said apertured portion to assist in releasing a cup from the mandrel and blowing the same from the mandrel, and means to overcome any back or holding current of air working rearwardly between the mandrel and the cup."

The defendant's position in respect to infringement of these claims is not sound. There is no escape from the fact that the defendant in some of its machines made use of a supplemental air blast. It does not escape infringement by asserting that in its commercial machines no such supplemental air blast is used.

But invalidity of these claims is asserted because of Palmer patent No. 1,312,570, and particularly figure 32 thereof. The Palmer patent provides a back or liner for a rigid pasteboard box. In figure 32 an air-jet is shown. This is controlled by a manually operated valve. The means disclosed are for taking the container away, not from the mandrel, but for removal after it has left the mandrel. I think for that reason the Palmer patent cannot be regarded as an anticipation.

Invalidity is asserted against claims 101, 102, 104, 107–111, 114, 152, and 153, on the ground that they set forth mere aggregations. Of these I have held 101, 102, 104, 107–111, and 114 not infringed. Nevertheless it may prove pertinent to consider the question ·of validity of the claims. The argument is raised that there is no connection between the manner in which a cup may be made and some subsequent operation performed on a cup no matter how made on an adjacent or associated part of the same machine.

Claim 101 reads: "101. In a machine for making paper, cups or the like, a rotatable turret, a mandrel carried by the turret, means for forming a bottom on the end of the mandrel, means for forming a body on the mandrel and securing it to the bottom to form a cup, means for discharging the cup from the mandrel, a container adapted to receive the cup from the mandrel, and a flanging device adapted to cooperate with the container for forming a flange on the upper end of the cup."

The first part of the claim refers to a rotatable turret carrying a mandrel and means for forming a bottom of a paper cup on the end of the mandrel, means for forming the body of the cup on the mandrel and securing the body to the bottom to form a cup. The second element really is the means for discharging the cup from the mandrel, next a container to receive the cup from the mandrel is defined, and finally there is included a flanging device to cooperate with the container for forming a flange on the upper end of the cup.

The application ·of the principle that · a mere aggregation is not patentable is not always easy, though the rule itself is very clear as stated in Reckendorfer v. Faber, 92 U.S. 347, 356, 23 L.Ed. 719. A combination of old elements operating together in substantially the same way, and not modifying the operation of the separate parts so as to produce any new or different result, is a mere aggregation of parts and not patentable, but a recent statement in this circuit in Sachs et al. v. Hartford Electric Supply Co. (C.C.A.) 47 F.(2d) 743, 748, sets forth the difficulty encountered in attaching a definite meaning to the term "aggregation." It was there said: "The co-operation of the means necessary

516

to create an invention is to be measured by the purpose to be fulfilled, *not by the interaction of the parts.* Each factor must indeed be a condition to that result, but the whole may be a mere assemblage; the co-operation between them all may be no more than their necessary presence in a unit which shall answer a single purpose. Therefore, we can find little advantage in a discussion of what is or what is not an 'aggregation.' In patents, as in other branches of the law, the question is of the interests involved; inventions depend upon whether more was required to fill the need than the routine ingenuity of the ordinary craftsman. Such a standard is no more of a will-o'-the-wisp than others which the law adopts, reasonable care, reasonable notice and the like; the effort is to fix that standard by recourse to average propensities, dispositions and capacities. Any attempt to define it in general terms has always proved illusory; it is best to abandon it."

The plaintiff contends that there is no element mentioned in this or any other of the so-called aggregation claims which does not directly contribute to the production of a unitary result, namely, the formation of a complete cup. But that hardly seems to be so, for certainly a complete cup is made before the discharge thereof is effected for the purpose of making it a different variety of cup, i. e., of curling the top of the cup on the third turret. The situation is this: Suppose the existence of two independent machines, the first of which produces a complete cup of uncurled top-edge; and the second machine does no more than curl that edge. Can it be said that bringing those two machines in proximity to each other so that the two machines will function as one is invention? I think not. The law of invention, as was said in Reckendorfer v. Faber, cited, requires something "more than a change of form, or juxtaposition of parts, or of the external arrangement of things, or of the order in which they are used, to give patentability."

Claim 102 in principle is the same, except that it mentions no flanging device as does claim 101, but provides merely a container to receive the cup when discharged from the mandrel and adds "means for discharging the cup from the container," i. e., another independent operation. The means disclosed and the operation performed do not co-operate with one another but reveal the sum of the effects or results of the separate parts.

Claims 104, 107–111, and 114 fail for the same reasons. See Richards v. Chase Elevator Co., 158 U.S. 299, 15 S.Ct. 831, 39 L.Ed. 991; Muser v. Bell (C.C.A.) 278 F. 904; Siekert & Baum Stationery Co. v. Stationers Loose Leaf Co. (C.C.A.) 51 F.(2d) 326.

Claims 152 and 153 present rather a different picture. In these claims a subcombination is set forth, the parts of which do actually coact to produce a unitary result. For example we find in these claims the association of a mandrel in the formation of a cup, means provided with a seat adapted to receive the cup as formed on the mandrel, and air means for freeing the cup and for delivering the same into the seat under pressure to assist in centering and fully inserting the cup in the seat. These means do coact. Though they omit any reference to specific means for the operation on the cup when it is in the seat or container, they do define a combination for locating the cup ready for any operation that it may be desirable to perform. I think neither of these claims should fall because of the alleged aggregation of means.

However, though valid, the claims are not infringed. In the defendant's machine there is no delivery of the cup to any seat. The cup is dropped by gravity to a container, which container has no bottom. The defendant uses an additional means and operation to press the cup down in the container for contact with a plate beneath.

Claims 154, 155, and 156, will be treated as one group. They relate to delivery of the completed cup by means of a propelling current of air, together with means for guiding the discharged cups, open-end forward, so that the action of the cup in the completion of its travel will effect a relatively gentle ultimate deposit thereof. The use of air for the purpose of unseating a manufactured article is, of course, a well-understood principle and is disclosed in the Luellen & Wessman patent.

The defendant's method can be distinguished from the means defined in claims 154 and 155 because the defendant blows its cup through a goose-neck, as shown in Luellen and Wessman, and without effecting the so-called "gentle ultimate deposit." The two mechanisms are different.

The patentees, in order to effect the gentle deposit, employ an open guideway to permit not only the escape of the cup, but also the air. The defendant blows its cup through a goose-neck such as is shown in the Luellen & Wessman patent, and does not relieve the pressure in the goose-neck. Accordingly neither claim 154 nor 155 is infringed.

Claim 156 does not in terms describe the deposit with the limiting phrase of claims 154 or 155, but does include an element defined as "a yieldable obstruction in the path of movement of the cup to insure a steady, slow delivery of the cup, said last mentioned means after momentarily tending to retard the cup, automatically giving way to permit the discharge of the cup." Whether the defendant uses a yielding finger at first was not clear. In its prima facie case Dr. Thatcher for the plaintiff contended that the pusher, CC of Defendant's Exhibit P, constituted this retarding means; but in rebuttal the plaintiff relied on the testimony of the witness Hans, a former employee of the defendant, who said that Plaintiff's Exhibit 33 was not a complete description of the construction of defendant's machine in that there were lacking spring stops which were used "to slow the cup down when it gets in its next position; without that they would probably fly right out on the floor." These spring stops consist of "shimmer brass or light spring steel, just let out smaller than the diameter of the cup, just to slow it up, fastened on the end of the chute." This spring member would seem to be the equivalent of the trip fingers disclosed in the specification and drawing of the patent in suit.

I conclude that claim 156 is infringed.

Finally it is contended that the Wessman & Stone patent was illegally issued. The patent on its face shows that it was issued to Individual Drinking Cup Company, Inc., of Easton, Pa., a corporation of Pennsylvania. It is true that when the application was filed it was accompanied by an assignment by which the title to the application was transferred to Individual Drinking Cup Company, Inc., a New York corporation. This assignment was executed on March 30, 1923, and recorded April 4, 1923. The New York corporation was then in existence though it had changed its name on December 27, 1922, to the Dixie Drinking Cup Corporation. It is contended that when Wessman and Stone assigned their application to the Individual Drinking Cup Company, Inc., the New York corporation, all title and dominion therein passed out of the hands of Wessman and Stone and to the New York corporation. No assignment was made from the New York corporation to the Pennsylvania corporation. What took place was that Wessman and Stone, who had parted in 1923 with their right, title and interest, changed the original assignment to the New York corporation by altering the name of the state, under which the assignee was supposed to be incorporated, from New York to Pennsylvania. This was done in 1930. It appears, however, that the Dixie Drinking Cup Corporation, the New York corporation, formerly the Individual Drinking Cup Company, Inc., of New York, was the sole owner of the stock of the Pennsylvania corporation and was itself not an operating company, and that the Individual Drinking Cup Company, Inc., of Pennsylvania, was the operating company.

It seems indisputable that the corrected assignment did nothing more than to effect the intention of the parties. Thereafter title by agreement passed to the plaintiffs in this action.

Patent No. 1,256,913 to L. W. Luellen.

This patent is for an improvement in a cup container and has for its object means for stacking nested cups and presenting these in position for ready removal, one by one. Of the seven claims, all but the sixth are in issue. The defense is invalidity. This patent expired February 19, 1935. Claim 1 may be considered as a typical claim. It reads: "1. A sanitary cup holder, comprising an upright tubular cup receptacle having an open lower discharge end and one or more spring pressed cup supporting shoulders adapted to wholly support a stack of nestable cups therein in such manner that the lowermost cup is held in a partially exposed position capable of being removed from its support independent of the others above it."

The prior art discloses a number of patents on which the defendant relies. Among them that to Ruehs, No. 1,010,320, will first be considered. The application was filed on August 18, 1909, antedating Luellen by slightly more than two years. The Ruehs device is of tubular construction and is provided with an open discharge end at the bottom and a closed upper end. The

inventor states that it is preferred to employ cups having a flaring wall in order that they may be nested together so as to economize space. The cups are supported in the receptacle in such a way that the lowermost cup may be partly exposed and held in a convenient position for removal from the receptacle. The flange of the lowermost cup rests upon movable shoulders on the cup holder. The mechanism provided consists of pins or studs upon spring arms to secure these arms to the walls of the receptacle in such position that the pins or studs may project into the path of the flanges of the cups. The drawings show the arms screwed to the wall of the receptacle at a point above the discharge end with the pins and studs extending into the receptacle sufficiently far to engage the under side of the flanges of the cups whenever they reach their lowermost position.

The disclosure of the Ruehs patent seems to me a complete anticipation of the Luellen patent. The plaintiff realized the importance of this reference and sought to carry the Luellen invention to a date earlier than that of Ruehs. Plaintiff's witness Crosbie testified that he met Luellen about February 1, 1909. Luellen at that time had organized a corporation known as the American Water Supply Company for making and selling individual paper drinking cups and dispensers. Crosbie, testifying in 1937 as to a structure that he believed he saw in 1909, was not a convincing witness. The examination in part proceeded:

"XQ35. Will you look at the two figures on the second sheet that I show you, American Health Magazine, Exhibit RRR, and tell me if you remember what was the form of the devices for holding the cups in those dispensers as shown there? A. Not from the picture.

"XQ36. Well, from your recollection do you remember them? A. Well, from my recollection at that time they might have been either springs, a metal ring with lugs, or a rubber ring with lugs, any one of those three might be the device used.

"XQ37. Well, the metal ring with lugs, I believe you testified was not satisfactory, he did not put that out, did he? A. Well, not in quantities, nothing was put out in quantity at that time.

"XQ38. Which was the device that they were advocating for commercial use, such as in a publication like this? A.

The one—there were two types put out for public use, one the coin machine illustrated on the third page there, and the other the free cup dispensing device with the wall bracket."

The testimony is uncorroborated and of itself is not of sufficient weight to prove that Luellen antedated Ruehs. It is true that in a priority proceeding as between Ruehs and Luellen, Luellen was successful, but the evidence adduced in that proceeding is not before me and I cannot determine on what grounds the issue of priority was resolved in Luellen's favor. The affidavit which he filed in the prosecution of his application, but apparently not in the interference proceeding verified January 29, 1914, contains an averment that he conceived his invention, a cup container, in the early part of 1908. The affidavit also sets forth that in July, 1908, he had a container constructed for him by Edwin G. Wessman, substantially like that illustrated in the drawing which accompanied the application of the patent in suit. It is unfortunate that no corroboration of the important allegations of that affidavit was produced at the trial.

In the absence of such corroboration or other proof Luellen will be held to his filing date. As was said in United Shoe Machinery Corporation v. Brooklyn Wood Heel Corporation (C.C.A.) 77 F.(2d) 263, 264: "When an inventor's date is to be carried back beyond his application, courts regard the effort with great jealousy, and must be persuaded with a certainty which is seldom demanded elsewhere; quite as absolute as in a criminal case, in practice perhaps even more so. Brooks v. Sacks, 81 F. 403 (C.C.A.1); Dey Time Register Co. v. W. H. Bundy Recording Co., 178 F. 812 (C.C.A.2); Bearings Co. v. Harris Hardware & Mfg. Co., 299 F. 782 (C.C.A.2). It makes no difference how the question arises; whether the patentee is carrying back his own invention, or a supposed infringer is carrying back his; the burden is the same as the proof necessary to establish a prior use."

Other patents in the prior art relied upon to show lack of patentability are those to Dean, No. 466,298; to Wilson & Nealy, No. 570,113; and to Luellen himself, No. 1,043,854.

The patent to Dean is for an improvement in magazine holders for cartridges. Though the cartridges are not nested and

are supported one above the other within the tube, the extraction of the lowermost cartridge will cause the next cartridge to drop into the position which the extracted cartridge occupied. Dean, in dealing with a rigid substance such as a cartridge, had a somewhat different problem from that which Luellen had to solve.

On the other hand, the Wilson & Nealy patent for a cork cabinet is a closer reference, despite the dissimilarity in the two arts. Corks are inserted in vertical tubes. The specification recites that the tubes are crimped at the lower end to retain the larger end of the cork after the smaller end projects in position to be grasped when required. As the lowermost or exposed cork is withdrawn from the tube, the column descends so that the operation can be repeated, withdrawing the then lowermost cork. In this device it is the cork which is flexible and the holder which is made rigid. The claims of the Luellen patent include supporting shoulders for the cups which are not found in the Wilson & Nealy device.

Luellen patent No. 1,043,854 is also for a cup-dispensing device of cylindrical formation. The diameter of the tube opening is somewhat greater than the maximum diameter of the cups at the flanges, but immediately adjacent to the opening and above it a reduced delivery passage is provided, having preferably rigid walls, the diameter of which passage is less than that of the cup flanges. The construction is such that the bottom of the bottommost cup will project from the device a sufficient distance to be grasped by the user. Between the chamber and the delivery passage a tapered throat is shown and so constructed as to engage the cup flanges frictionally. The specification recites that the walls of both the throat and delivery passage may be circumferentially discontinuous or may be continuous, but in either case the surface contacting with the ends of the cup flanges offers frictional resistance so that the weight of the entire stack of cups is balanced when a few of the flanges engage the throat and passage.

It is apparent that alone neither Dean nor Wilson & Nealy, nor Luellen patent No. 1,043,854, is an anticipation of the Luellen patent in suit. But collectively on the question of invention they invite serious consideration. Though Luellen in the patent in suit states that it is intended that the cup will be yieldably supported in the container, it appears nevertheless that: "The yieldability may be either in the cup itself or in the device which engages it, or both the cup and the engaging device may be yieldable, so that upon force being exerted to remove the cup, yieldability of the support will be present and the cup will be removed without damage."

The question is thus narrowed to determining whether the addition of supporting arms to the tube walls of Wilson & Nealy, or the substitution of the supporting arms for the rigid, tapering, supporting ribs in Luellen No. 1,043,854, constitutes invention. The spring supports for performing the same function would appear to be indicated clearly in the Dean patent. To add the flexible supporting means shown in Dean to the device of Luellen patent No. 1,043,854 does not seem to involve invention.

However, that may be, I conclude that the Luellen patent in suit is invalid because of the Ruehs anticipation.

### Luellen Patent No. 1,336,469.

This patent is also for a dispensing apparatus. It was issued April 13, 1920, on an application filed March 24, 1911. The defenses against the patent are invalidity, undue extension of monopoly over Luellen's prior patent No. 1,131,255, laches and estoppel by reason of abandonment of claims in the Patent Office, and noninfringement.

Claims 3, 4, and 5 are in issue.

Claim 3 reads: "3. In a cup-dispensing apparatus, the combination with a cover-support, of a cup-support comprising two series of elastically-yieldable members for engaging the first cup of a series of cups about two spaced-apart zones."

The provision for two series of elastically yielding members for engaging the first cup of a series of cups about two spaced-apart zones is the element to be considered in this claim. The support for the column of cups differs from that shown in his earlier patents.

The improvement disclosed is the provision of an elastic gasket at the bottom of the reservoir cylinder interposed between an inwardly directed flange of the ring which supports the reservoir and the lower edge of the reservoir. The opening in the flange is shown of a sufficient diameter to permit the flange of the cup freely to pass through it; but the opening in the gasket is shown of a smaller diameter than

the flange of the cup and also smaller than the opening in the supporting flange of the cylinder. As the patentee states: "This affords an elastically yielding support for the bottom cup of the pile, and which support will yield upon the lowermost cup of the pile being pulled downwardly. The gasket will assume its normal position immediately after the passage through it of the flange of the cup and assume a position where it will engage the next cup in the pile."

To increase the flexibility of the elastic supporting device a modified form of the elastic gasket is provided. This is shown with two series of fingers, one series of different length than the other. The purpose is to give an increased gripping action upon the cups "which cups are shown provided with conical surfaces and unchanged." By means of these two series of fingers of different lengths the patentee states that "as the cup assumes its normal position in the holder and as it is drawn out, it will be gripped at two zones, one zone being gripped by the fingers 27 and the others by the fingers 28." Thus also it was sought to enable the next to the lowest cup to be retained in place even before the lowest cup was completely removed. However, "The fingers normally lie in the same plane as the body of the annular ring of the gasket 26 when in an unflexed condition."

It is clear that, when compared with the construction disclosed in Hussy patent No. 1,138,758, small scope if any should be accorded the Luellen improvement. Hussy discloses a rubber ring or gasket adapted to function in exactly the same way as the Luellen gasket. Hussy says: "The ring g may have its inner edge notched as is shown in Fig. 3, to reduce the stiffness at such part; or it may be devoid of notches as shown in Fig. 6. The cups may have flanges at the top as shown in Fig. 2 or they may be devoid of flanges as shown in Fig. 5."

Thus Hussy made provision for the support and discharge of both flanged and unflanged cups as did Luellen. There is no difference in structure between the two except that Luellen varied the length of the Hussy notches. That does not seem to me to be invention.

Nor does the defendant's structure embody the Luellen invention. As described by Dr. Thatcher, plaintiff's expert, the defendant makes its cup-supporting member out of nine strips of spring metal bent so as to have a shoulder extending in opposite directions at each of the two ends of the spring. They project into the delivery opening of the device at different horizontal levels.

In the defendant's device no two sets of fingers ever engage the same cup. In the defendant's dispenser the cups are normally supported by an upper row of springs. If in pulling down a cup that above the cup to be released passes the upper set of springs, it may be supported on the second set of springs or even on the third set of springs; but even in that case the second or third sets of springs will support only the single cup that escapes below the upper row of springs and the balance of the column is wholly supported by the upper springs. This is certainly true of flanged cups. If, however, flangeless cups were used in the defendant's dispenser, the contact of defendant's springs with the body of the cup is only with that portion of the body which would be rolled to form the flange.

It is doubtful whether any fair reading of the specification would lead one to conclude that anything like the defendant's construction was contemplated by Luellen with his rubber gasket.

Claims 4 and 5 speak of "fingers having their cup engaging portions situated in a plurality of planes parallel with their plane origin," though the specification says: "The fingers normally lie in the same plane as the body of the annular ring of the gasket 26 when in an unflexed condition."

The defendant's device has three sets of vertical springs, the tips of which extend within the cup chamber and at all times are in different planes, and so functionally as well as structurally the defendant's springs are different from the fingers of the patent in suit.

The record discloses protracted interference proceeding between Luellen and Nias, and between Luellen and Hussy, and though the Luellen application was filed March 24, 1911, it was not until February 23, 1918, after Luellen had been in interference, that by amendment he inserted that part of the specification setting forth the advantage of supporting the stack of cups by the upper set of fingers at the moment that the lowermost cup is withdrawn. Claims 4 and 5 had in effect been held un-

patentable over the construction shown in Hussy patent No. 1,138,758 on the holding that the difference was one involving only mechanical skill.

I find then that these claims are neither valid nor infringed.

Design Patent No. 74,793.

This patent was granted for an alleged new and original and ornamental design for a paper cup. The claim of the patent is "the ornamental design for a paper cup or similar article as shown."

Presumably it is the decoration of the cup which presents the alleged novel and ornamental feature, and not the shape of the cup, for paper cups of that type were old in the art. It must be admitted that the defendant's design is not too dissimilar and that a fair case of infringement might be made out, if the Johnson design presented marked evidence of originality.

However, both designs are of a most conventional order. A festooned or necklace-like border with the associated elements at the base are sufficiently illustrated in the prior art to destroy any suggestion of originality.

Design patent to Walter, No. 43,705, issued March 11, 1913, discloses, in an ornamental design for a plate, a festooning effect with a suspended pendant. A similar design is shown in the china plate, cup and saucer, Exhibits $U^1$, $U^2$, $U^3$. The January, 1910, issue of the American Pottery Gazette contains similar design effects for household china. The plate CX of the publication entitled, "Furniture, Upholstery and House Decoration," published in 1904, while not so close a reference, indicates a similar festooning, as does the design in the canopy of Napoleon's bed found in the same publication, "A Historical Guide to French Interiors, Furniture, Decoration, Woodwork and Allied Art." If it be contended that the identical design is not found in any of these cited references, it can be urged with equal force and effect that the defendant's design is not an identical copy of the Johnson design. Certainly the differences between the two are as great as those disclosed between the prior art discussed above and the Johnson design.

I conclude, therefore, that the Johnson design patent is invalid for lack of invention.

Trade-mark No. 301,390, for the name "Chily-Bear"

This trade-mark was issued February 28, 1933, on an application filed February 20, 1932, for containers of paper or cardboard-like material for frozen confections. The trade-mark consists of the words "Chily-Bear."

The defendant manufactures cups intended for frozen confections. These cups contain the name "Sunbeam" in conjunction with an Arctic pictorial scene which includes presentation of two polar bears and the rays of the sun. The prominence given to the word "Sunbeam" in the representation on defendant's receptacles certainly eliminates any question of infringement of the "Chily-Bear" trade-mark.

For the same reason defendant's "Freezer" cups do not infringe, for despite the Arctic scene the prominence given to the term "Freezer" and to the dogs and the dog sleds shows a dissimilarity to the "Chily-Bear" trade-mark sufficient to avoid any reasonable contention of infringement.

Copyright Print No. 16,169

This concerns a copyright registration in the office of the Register of Copyrights. The certificate which was issued February 19, 1932, relates to a print or pictorial registration. This pictorial illustration consists of an Arctic scene, icebergs, low rays of the sun, a polar bear in the foreground, and the term "Chily-Bear." The certificate of registration was procured pursuant to the provisions of the Copyright Act of March 1909, § 55, as amended by the Act of March 2, 1913 (17 U.S.C.A. § 55).

It is contended that the copyright is invalid because the application was made to the Register of Copyrights instead of to the Commissioner of Patents and the certificate issued from the Register of Patents and not from the Patent Office. In other words, what the plaintiff sought to have copyrighted was a commercial print.

Title 17, U.S.C., § 63 (17 U.S.C.A. § 63), provides: "In the construction of this title, the word 'print' shall be applied only to pictorial illustrations or works connected with the fine arts, and no prints or labels designed to be used for any other article of manufacture shall be entered under the copyright law, but may be registered in the Patent Office. And the Commissioner of Patents is charged with the supervision and control of the entry or registry of such

prints or labels, in conformity with the regulations provided by law as to copyright of prints, except that there shall be paid for recording the title of any print or label not a trade-mark, $6, which shall cover the expense of furnishing a copy of the record under the seal of the Commissioner of Patents, to the party entering the same. (June 18, 1874, c. 301, § 3, 18 Stat. 79.)"

█ This section was not repealed by the Copyright Act of 1909. Jeweler's Circular Pub. Co. v. Keystone Pub. Co. (C.C.A.) 281 F. 83, 26 A.L.R. 571; Hoague-Sprague Corporation v. Frank C. Meyer Co., Inc. (D.C.) 27 F.(2d) 176.

Was the print in suit to be employed in connection with the fine arts? The plaintiff's witness Dawson admitted that the copyrighted picture was not used for any purpose other than for a paper cup, a commercial article.

█ I must conclude, therefore, that the registration is invalid.

### Unfair Competition.

This is the last of the causes of action to be considered. In some respects it presents an unusual combination of circumstances. The controversy between the parties and their respective predecessors is of long standing. Plaintiff contends its predecessor, the Individual Drinking Cup Company, preceded the Public Service Cup Company, the predecessor of the defendant, in the business of making paper cups; that a single piece pleated cup was first manufactured by the plaintiff's predecessor under Luellen patent No. 1,308,793, and that defendant's predecessor was sued for infringement of that patent; that litigation resulted in the defendant's acquiring first a license and then the ownership of the patent on the single piece pleated cup. Thereafter the defendant followed the plaintiff in the manufacture of the two piece type decorated and tinted cups and endeavored to copy, so it is charged, not only the design patent heretofore disclosed, but also the sizes, dimensions, tapers, and tints, and arbitrary sales numbers applied to such cups, with the intention of causing confusion in the trade and profiting by the good will which had been established by the plaintiff.

█ That the defendant found much to admire in the plaintiff's products and methods of doing business is inevitably the inference to be drawn from the record in this case. Whether its acts of appreciation fall within the law of unfair competition is another matter. There was presented no evidence of actual confusion or deception on the part of the public and no evidence that any one engaged in the trade, or the ultimate consumer, was ever misled by any of the defendant's acts. Plaintiff contends that despite this it is sufficient to show mere likelihood of deception to warrant relief, and, of course, such is the law. Thum Co. v. Dickinson (C.C.A.) 245 F. 609.

Particular features of imitation relate to colors, numbers, price lists, designs, similarity in dispensers, in addition to the alleged copyright infringement and design patent infringement.

First, as to the colored price lists: The defendant has used a blue and yellow price list system since 1927. These are lists used in connection with sales to the dealer—not to the consumer.

The plaintiff used yellow and blue sheets for wholesale and retail prices; it also includes a white price list and apparently maintained no uniform use of colors throughout the period for the specific object sought from 1930 on. It is impossible to conclude that the colors on the price sheets, as used by the plaintiff, identified the source of origin of its products.

As to the shape and size of the cups, likewise there is failure to prove that they are identified in the public mind with the product of the plaintiff. Throughout the period from 1912 on, cups of various shapes and sizes, substantially similar to those of the plaintiff, were made by various manufacturers and in particular by the American Paper Goods Company.

Cellophane wrapping: Plaintiff claims priority with respect to the use of a transparent cellophane wrap. As early as 1927, however, the defendant used a glacene wrapping and, when cellophane became available in 1931, defendant's predecessor changed to cellophane. It is doubtful whether the Dixie Company was the first to use cellophane as a wrapping, but certainly it was not distinctive with that company. The evidence shows that the American Paper Goods Company, the American Lace Company, and the Castle Paper Service Corporation, as well as the Vortex Company, employed cellophane as a wrapper.

Evidence as to priority in the use of the different tints or colors establishes no monopoly right in the plaintiff. Manufacturers were experimenting with various shades, the defendant as early as 1925 using half a dozen different shades. It is true the paper itself was not tinted, the inside of the cup being white and only the outside tinted, but for many years the defendant has used paper tinted throughout.

The comparison of packaging leads to no inevitable result of confusion either.

There was a similarity in the use of stock numbers which was developed by the proof, but whatever copying was done by the defendant may be explained by a desire to establish in the trade uniform stock numbers for the benefit of dealers. It is difficult to see how in any case the adoption of similar stock numbers led to the slightest confusion. Indeed, it is a practice actually sanctioned by the trade.

Bergman testified that F. W. Woolworth Company, among others, requested the defendant to carry the same stock numbers as those of other concerns where there was a comparable package involved. The numbers apparently do not identify any particular manufacturer, since they are used by several, but the adoption was primarily a matter of convenience for the purchaser. In addition to the defendant, Bergman listed the Puritan and the American Paper Goods Company as following the practice of employing the same numbers for corresponding cup sizes. The practice has been approved. Electric Auto-Lite Co. v. P. & D. Mfg. Co. (C.C.A.) 78 F.(2d) 700; Dennison Mfg. Co. v. Scharf Tag, Label & Box Co. (C.C.A.) 135 F. 625; Keller, Inc., v. Chicago Pneumatic Tool Co. (C.C.A.) 298 F. 52; Amoskeag Mfg. Co. v. Trainer, 101 U.S. 51, 25 L.Ed. 993.

Each party sells its own dispensers. Plaintiff has its decoration following the festooned design of its design patent and the defendant's dispenser has likewise its design. How confusion is likely to be caused in the trade by any such practice I cannot understand, nor is there any evidence of such confusion. That a dealer or customer should use a Gem cup in a Dixie dispenser, or vice-versa, is no evidence of confusion, nor is there evidence that the decoration of the glass dome had anything to do with the transaction. It is probably all a matter of convenience. If a dealer has Gem cups on hand and no Gem dispenser available, I see no element of unfair competition in his use of a Dixie dispenser. The user of the cup is not in the slightest degree interested in the dispenser from which the cup is delivered.

That indeed is the plaintiff's great difficulty in this whole matter of unfair competition. Nobody is deceived. Nobody is confused. There is no evidence that there is a palming off of the goods of one for the goods of the other manufacturer, and no evidence that there is any likelihood of a successful attempt to palm off defendant's wares as and for the products of the plaintiff. I think the most that the defendant can be accused of is a flattering appreciation of plaintiff's successful business practice, but, as I have indicated, such appreciation falls short of unfair competition.

The plaintiff may have a decree in conformity with the foregoing opinion as to the Wessman & Stone patent. The complaint as to the other causes of action will be dismissed. If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.